**UNITED STATES of America, Appellee,**

v.

**Jerome Fleet COWDEN, Defendant, Appellant.**

**No. 76–1025.**

United States Court of Appeals, First Circuit.

Nov. 16, 1976.

Certiorari Denied Feb. 28, 1977. See 97 S.Ct. 1181.

John W. Marshall, Boston, Mass., by appointment of the Court, with whom Hamilton & Lamson, Boston, Mass., was on brief, for appellant.

Henry H. Hammond, Asst. U. S. Atty., Boston, Mass., with whom James N. Ga-

briel, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Indicted with four others [1] for transporting and causing to be transported in interstate commerce falsely made, forged and counterfeit checks in violation of 18 U.S.C. §§ 2314 [2] and 2,[3] and for conspiracy to commit that offense, Jerome Fleet Cowden was convicted on all counts at a jury trial conducted separately from the trials of his codefendants. On appeal he contends that the Government's evidence was insufficient to convict and that there were errors in the trial. We affirm the judgment.

The indictments of Cowden and the four others grew out of an FBI investigation of two forged checks, each in the amount of $97,500, drawn on the account of Charles R. Brennick at the Coolidge Bank and Trust Co. in Watertown, Massachusetts, and made payable to, and bearing the purported endorsement of a Jacob Weiner. Brennick testified that he had not signed the checks and that he had never heard of anyone named Jacob Weiner. The checks were taken from Boston to New York City by Edward L. Street, one of the four indicted with Cowden, where he deposited the checks in the account of the Interstate and Overseas Bank (IOB) at the Bankers Trust Company.

FBI Agent Claus, who interviewed Cowden on two occasions testified to the contents of statements then given to him by Cowden.[4] Cowden, an attorney, told Claus that he was contacted by telephone in late November, 1974, by an individual who identified himself as Jacob Weiner and who discussed with him "the business of cashing two checks through an overseas bank." Cowden said Weiner was unknown to him prior to that time. After this initial phone contact, Cowden said that he contacted Carl Thomas Bannon, a Boston money broker, and discussed the proposed transaction. Bannon advised that a Mr. Edward Street could be used to cash the checks. Cowden went on to tell Agent Claus that a few weeks later, on December 7, 1973, Weiner came to Cowden's office in Brookline, Massachusetts and delivered to him the two checks, each for $97,500, postdated December 10, 1973, drawn to Weiner's order on the account of Charles R. Brennick and endorsed in blank by Weiner. Cowden stated that he requested Weiner to show some identification, and in response Weiner showed what appeared to be a Massachusetts driver's license, although Cowden told the FBI agent that he saw neither the picture nor any of the writing on the license. Weiner, said Cowden, told him that he had been referred by some of Cowden's clients in the Sudbury area, but never

---

1. Carl Thomas Bannon, Richard Kilcullen, Francis Ashby Reddall, and Edward L. Street were tried and convicted in different proceedings.

2. Section 2314 provides, in pertinent part:
    "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; . . .
    "Shall be fined not more . . . than $10,000 or imprisoned not more than ten years, or both."

3. Section 2 provides:
    "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

4. Claus interviewed Cowden first on January 31, 1974. Cowden terminated that interview when Claus asked him to supply handwriting specimens. Two weeks later, on February 14, 1974, Cowden returned with counsel and furnished the handwriting specimens.

Prior to allowing Claus's testimony as to Cowden's statements, the district court held a hearing on the voluntariness of the statements, as requested by defendant under 18 U.S.C. § 3501. The court determined the statements were given voluntarily and, therefore, allowed Claus to testify as to what Cowden had told him. *See* discussion, *infra*.

did mention the names of the referring clients; he further told Cowden that he had heard of Cowden's reputation for handling financial and legal matters.

Upon receiving the two checks from Weiner, Cowden said that he went to Bannon's Boston office, paid Bannon a $1,000 fee for arranging a meeting with Street, and, after Street arrived, gave him the two endorsed checks, it being agreed that Street would negotiate them through "normal banking channels". Cowden stated that he had never met Street before and that they exchanged identification. The proceeds of the checks were supposedly to be dispersed according to directions Cowden would give later; and a fee totalling $35,000 was to be paid to Bannon and Street for the cashing of the checks.

There was evidence that Street took the checks to New York City on the same day, December 10, 1973, and there deposited them in the IOB account,[5] which he had established one week previously, on December 3, 1973, with the aid of codefendant Kilcullen. On December 19, 1973, after the checks had cleared Brennick's Coolidge Bank account Street withdrew $100,000 in ten $10,000 Banker's Trust cashier's checks and carried the checks to Hingham, Massachusetts, where on the same day he opened a savings account with the Lincoln Trust Company and deposited nine of the ten checks. Lincoln Trust would not release the funds immediately, despite requests from Street on December 19, 21, 24, and 26, 1973, to allow him to withdraw $90,000 in cash or at the very least $55,000 "to meet a payroll". Mr. McDavitt, the branch manager of Lincoln Trust at the time, testified that during his phone conversation with Street on December 24, 1973, a man who identified himself as Mr. Cowden, Street's lawyer, got on the phone and inquired, in an "abrasive" tone, what was deposited in Street's account. McDavitt refused to give out this information. The $90,000 became available to Street on December 27, 1973,

after Banker's Trust had sent a telegram confirming that the cashier's checks had cleared. On that date Street withdrew $55,000, again indicating that its purpose was for a "payroll".

Cowden, who told the FBI that he could not disclose Weiner's instructions for disbursing the proceeds because it would violate the attorney-client privilege, acknowledged in his statement to the FBI agent that he received payments from Street on two separate occasions in late December 1973. These occurred, he related, after he had learned that the two Weiner checks had been negotiated through Banker's Trust in New York. The first occasion was when Street delivered two checks payable to Cowden drawn on the IOB account, one for $20,000 and one for $5,000, just prior to the time the funds at Lincoln Trust became available for withdrawal. The second occasion was on December 27, 1973, after Street withdrew the $55,000 in small bills and, following Cowden's instructions, delivered the entire sum to Cowden on the side of a road in Marshfield, Massachusetts. Cowden's statement continued that he returned with the money to his home in Brookline and there turned over the $55,000 in cash to Weiner personally. In return, Cowden said, Weiner gave him a receipt for $195,000, the total amount of the two checks.

Cowden gave the FBI a general description of Weiner, but stated that he did not know Weiner's employment or where he lived, although he speculated that Weiner lived in the Allston area of Boston, perhaps on Commonwealth Avenue. Cowden added that he had tried unsuccessfully to locate Weiner at a large apartment complex at 2001 Commonwealth Avenue. Cowden said that the only way he got in touch with Weiner was to call a specific telephone number and leave a message, and Weiner would return the call. Cowden stated that he had either lost or thrown away the piece of paper containing that telephone number

**5.** Telephone records introduced at trial established that on December 10 Cowden twice called the number of the New York law firm

where Kilcullen, Street's friend and confidant, worked.

and did not know otherwise how to reach Weiner.

FBI Agent Claus testified that, based on Cowden's sketchy information about Weiner, he conducted an investigation, but could find no trace of anyone by that name fitting the description Cowden had furnished. All of the FBI's "usual" methods were said to have been followed. The Massachusetts Registry of Motor Vehicles showed licenses issued to two Jacob Weiners, but one had died in 1968 and the other did not fit the physical description of Weiner given by Cowden. Focusing their investigation on the three-building apartment complex at 2001 Commonwealth Avenue, the FBI talked to the building superintendent, a person in charge of parcel deliveries, the regular mail carrier, and the rental agent without finding any trace of a Jacob Weiner.

In his statement to FBI Agent Claus, Cowden said that he was a close personal friend of Francis Ashby Reddall, one of the other men indicted, who served as the bookkeeper for Brennick. Cowden and Reddall had resided together for a period at an apartment in Boston. Cowden also told Claus that he was acquainted with Brennick himself, having been introduced to him by Reddall and having contacted him on three separate occasions in past years concerning business deals.

Mr. Brennick's testimony confirmed these prior contacts between Cowden and himself. He testified that Reddall first introduced him to Cowden in the fall of 1972 for the purpose of discussing whether Cowden might take over responsibility for some of Brennick's many business projects. After a short talk, Brennick decided against hiring him. Six months later, Brennick went on, Reddall set up a second meeting between the two men in which Cowden attempted to interest Brennick in purchasing a piece of land as a possible nursing home site. After considering the proposition for several months, Brennick decided against it. In the last telephone conversation about the matter, Brennick testified to becoming "very upset" with Cowden, telling him that there

was no way he "wanted anything to do with it because he [Cowden] was bothering me altogether too much. . . ." Several months later, Reddall brought Cowden to Brennick with a third proposal: this time Cowden offered Brennick a half interest in a medical malpractice suit which Cowden wanted to litigate in Utah. Brennick turned down the offer.

Brennick also testified concerning the general nature of his business at the time of the forgery and the circumstances surrounding the forged checks. A developer and limited partner of eighteen nursing homes in several states in December, 1973, Brennick was managing an extensive business operation financed mostly by mortgage and construction loans. Each of the nursing homes had two bank accounts, one with a local bank in the area where it was located and a second with the Coolidge Bank and Trust Co. in Watertown, Massachusetts, where Brennick had his personal account. In order to make maximum use of liquid funds available to all the nursing homes, Brennick frequently transferred sums of money from a nursing home's local account to his personal account by use of presigned checks and then retransferred the money from his personal account to the account of another home that needed funds immediately. The accounting of these transfers was delegated to Brennick's bookkeeper, Reddall, who also prepared checks for Brennick's signature, including any checks necessary to cover overdrafts on Brennick's personal account. Brennick's checks had been specially ordered for him by Reddall. With respect to December, 1973, Brennick testified that he was expecting a large mortgage loan of a net amount of $1,400,-000 on December 3 but that the loan was delayed for approximately one week. During that week, Brennick's creditors, who had been expecting payment on December 3, were told, on a day-to-day basis, that they would "have to wait a little longer." Most of the contacts with these creditors were handled by Reddall. The loan finally came through and was transferred to Brennick's personal account on December 10, 1973.

On that same day, the forged checks, dated December 10, 1973, were deposited with Banker's Trust, and two days later, on December 12, 1973, they cleared Brennick's personal Coolidge Trust account through normal banking channels. If the checks had been presented for payment prior to December 10, the date on which the mortgage loan came through, Brennick's account would have had insufficient funds to cover them. Reddall was one of the few people aware of the personal account balance during this period, the expected loan, and the date when the loan actually was credited to the account. Brennick testified that Reddall and Cowden, close friends, were in frequent contact, Cowden looking in on Reddall at Brennick's office in Milton 25 or 30 times during the several years that Reddall worked for Brennick and calling him regularly on the phone. These contacts intensified during the week of December 3, 1973.

Brennick testified on direct examination that he made occasional trips to Las Vegas, Nevada, to gamble, and that when he lost money on these trips he would follow the practice of making out a check to a fictitious payee, California Clearing Corporation, George Peterson, or Charles Peterson, which were names used by gambling casinos to help customers hide the fact that they had lost money gambling. On cross-examination, it was brought out that during the three-year period 1971–1973 Brennick had made out checks to these three payees totalling $262,800 for gambling losses.

## I

█ In arguing that the evidence was insufficient to convict, Cowden focuses on its alleged inadequacy in two respects. First, he says, the Government did not prove that he knew the checks were false, and, second, it did not prove that he himself transported or caused to be transported the two checks in interstate commerce.

Neither argument has merit. The latter rests on the proposition that Cowden neither transported the checks in commerce himself nor could have "caused" Street to transport them because it was not shown that he knew, or reasonably could have known, that Street would take them to New York and negotiate them there rather than in Massachusetts. *See United States v. Scandifia,* 390 F.2d 244, 249 (2d Cir. 1968), *vacated and remanded on other grounds sub nom. Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *cf. United States v. Sheridan,* 329 U.S. 379, 391, 67 S.Ct. 332, 91 L.Ed. 359 (1946); *Nicolopoulos v. United States,* 332 F.2d 247, 248 (1st Cir. 1964). The most obvious answer to this is that there was ample evidence from which to infer Cowden's awareness of Street's transportation of the fraudulent checks to New York. Not only did Cowden procure Street's services and discuss matters with him in advance of the trip, but also telephone records show that he twice called the New York number of Kilcullen, Street's accomplice, on the same day Street travelled to New York and deposited the checks. There was also abundant other evidence, mentioned below, from which the jury could infer that Cowden was a knowing participant in all that transpired both in New York and Massachusetts. Cowden was indicted, moreover, under 18 U.S.C. § 2, which makes punishable as a principal one who "aids and abets" in the commission of an unlawful act, and the jury was fully charged on this theory, without objection. *See* note 2, *supra. Compare Scandifia, supra* (where only a "causing" theory was submitted). On an aiding and abetting theory, section 2314 does not require knowledge with respect to the interstate transportation. All that must be proven is knowledge that the security was forged, falsely made or counterfeit, together with the fact of its interstate transportation. *See United States v. Strauss,* 443 F.2d 986, 988 (1st Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *United States v. Tannuzzo,* 174 F.2d 177 (2d Cir.) (A. Hand, J.), *cert. denied,* 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed. 493 (1949).

█ The issue remaining, therefore, is simply whether the Government's evidence

was sufficient to support a finding that Cowden knew the checks were forged, falsely made or counterfeit when he turned then over to Street. We think it was. Had the checks been recently stolen, evidence that Cowden possessed the checks and the absence of adequate evidence explaining his possession would have justified a jury's inferring his guilty knowledge beyond a reasonable doubt. *Barnes v. United States,* 412 U.S. 837, 845, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1972); *United States v. Infanti,* 474 F.2d 522, 525 (2d Cir. 1973). Whether an analogous inference may be drawn from the inadequately explained possession of recently forged or counterfeit instruments we need not inquire; here Cowden's possession of the checks and his arranging for their cashing, were accompanied by a host of circumstances suggestive of Cowden's guilt. And Cowden's explanation to the FBI was so incredible as itself to permit an inference of guilt—on the theory that such an obvious fabrication could only have been adopted to cover his criminal participation. *See Wilson v. United States,* 162 U.S. 613, 620–21, 16 S.Ct. 895, 40 L.Ed. 1090 (1896).

The activities of Cowden and his coadventurers during December, 1973, were, to say the least, abnormal for persons acting honestly. A jury might think that if Cowden believed he was cashing valid checks, he would have taken them to a nearby bank for collection. Cowden instead assembled a task force worthy of a guerrilla commander; the checks were shipped to New York; the timing was orchestrated, obviously through use of inside knowledge, with Brennick's financial affairs in such a way as to ensure that funds would be available to honor them; and Cowden and the others proceeded with mounting intensity to withdraw substantial amounts of the funds, of which Street's roadside delivery of $55,000 in small bills to Cowden was perhaps the most colorful example. Throughout this period Cowden maintained constant telephone contact with the others.

Along with these singular occurrences, all suggesting that Cowden knew that he was dealing with items quite beyond the ordinary, we have Cowden's "explanation", which the Government rightly terms preposterous. The bogus checks came to him, Cowden told Agent Claus, from a man who disclosed nothing but his name (not even the names of Cowden's clients who referred him), and whose telephone number Cowden later destroyed or lost leaving Cowden without means to locate him. While Cowden saw the driver's license of the man, he could remember no details, and the man's instructions as to use of the funds had to be kept quiet because, said Cowden, of the attorney-client privilege.

Following upon this incredible narrative, the failure of both the FBI and Cowden to locate Weiner could reasonably lead a juror to conclude that no such person existed, and that Weiner was a fabrication. That Street was a complete stranger to Cowden when he took charge of the two checks, endorsed in blank, could seem equally doubtful, while the agreed $35,000 "fee" for Bannon and Street would make no sense at all if their only duty was to arrange for the cashing of two valid checks. The more likely explanation was that the defendants, acting in concert, had arranged to procure the phony checks and were parties to a scheme to cash them and share in the proceeds. Cowden's statement that the receipt in evidence for $195,000 was given to him by Weiner in return only for $55,000 cash could also contribute to a juror's conviction that there was never any Jacob Weiner, and that Cowden himself had simply retained the money.

Moreover, Cowden's close friendship with Reddall tied Cowden in with the insider whose help was essential to the scheme, and who was a far more likely source of the checks than the mysterious Weiner. As Reddall and Cowden were said to have been in frequent contact during the week of December 3, 1973, the week that the large loan to Brennick was due, the jury could have found that they were working in concert to time the cashing of the checks with the arrival of sufficient funds in Brennick's account. Brennick's account of his three prior meetings with Cowden each arranged by Reddall and each ending with Brennick

rejecting a business proposal offered by Cowden, suggested that Cowden's greed may have been heightened by resentment.

We conclude that there was ample evidence from which the jury could have found beyond a reasonable doubt that Cowden knew the two checks were forgeries at the time he had possession of them. Cowden's contrary argument amounts to no more than an invitation to view individual items of circumstantial evidence in isolation, rather than cumulatively, an approach we reject. *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964).

## II

■ Cowden alleges error in the district court's denial of his motion that the district judge recuse[6] himself under the provisions of 28 U.S.C. § 455(a), which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In his pretrial motion and on appeal, Cowden contends the district judge's impartiality "might reasonably be questioned" because the same judge presided over the two prior jury trials of the other four men indicted with Cowden and, therefore, might appear to have prejudged the issues presented in his case. The 1975 Amendment to 28 U.S.C. § 455 changed the standard for recusal from a subjective one, which left to the judge "in his opinion" the decision whether it would be improper to sit, 28 U.S.C. § 455 (1970), to the present objective standard requiring disqualification whenever the judge's impartiality "might reasonably be questioned". The change was intended to foster public confidence in the judicial system by requiring disqualification "if there is a reasonable factual basis for doubting the judge's impartiality . . . ." H.Rep.No.1453, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News p. 6355. But it was emphasized that litigants are not entitled to have a

judge disqualify himself merely because they fear an adverse decision.

"Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice."

*Id.* [Emphasis in original.] The proper test, it has been held, is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man. *See Parrish v. Board of Comm'rs of the Alabama State Bar,* 524 F.2d 98, 103 (5th Cir. 1975). *See also* Note, *Disqualification of Judges and Justices in the Federal Courts,* 86 Harv. L.Rev. 736, 746–47 (1973).

■ Applying this standard we see no ground for questioning the court's impartiality. There was no indication of personal animus or bias by the judge either in the proceedings which he conducted involving codefendants or in this proceeding. Appellant complains of several adverse rulings, but these do not indicate personal bias, and indeed appellant does not so claim. Insofar as the judge's presiding over the prior trials of Cowden's codefendants may have resulted in his learning about facts damaging to Cowden, the situation is not much different from when a presiding judge learns about evidence, later excluded, damaging to a defendant at a *voir-dire* or bench conference in the same proceeding. While judges attempt to shield themselves from needless exposure to matters outside the record, they are necessarily exposed to them in the course of ruling on the admission of evi-

---

6. This was Cowden's second effort to secure recusal of a judge. He had earlier moved under 28 U.S.C. § 144 against another judge, who, after stating that he was unacquainted with Cowden, withdrew.

dence; and the judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a separate trial in the same case. The mere fact, therefore, that a judge has already presided over the separate jury trials of codefendants does not, in our view, constitute reasonable grounds for questioning his impartiality in a subsequent jury trial involving a remaining codefendant. *Cf. Craven v. United States,* 22 F.2d 605, 607–08 (1st Cir.), *cert. denied,* 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (1927). *See also In re Union Leader Corp.,* 292 F.2d 381, 388–92 (1st Cir.), *cert. denied,* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961).

### III

■ Cowden claims that it was reversible error for the district court to have denied his motion to dismiss the indictment on the ground that Counts I and II, charging separate violations of section 2314 for each check, were multiplicitous, and to have later refused his requested jury instruction that the jury could convict him of only one of those two counts if it found the checks were transported interstate simultaneously. *Castle v. United States,* 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75, *vacating and remanding for resentencing,* 287 F.2d 657 (5th Cir. 1961) holds the simultaneous transportation of multiple forged securities to be but one offense under 18 U.S.C. § 2314. Here, after the jury found Cowden guilty on all counts, the court allowed a defense motion for acquittal on Count II, and sentenced him only under Count I. This action fully met the requirements of *Castle,* in which the remedy was simply a remand for resentencing. *Castle v. United States, supra; cf. United States v. Honneus,* 508 F.2d 566, 570 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). There is nothing to appellant's complaint of jury prejudice. Cowden could have been indicted in one count for both checks; while he has a right to be sentenced on only one count, he had no right to keep the second transaction from the jury.

### IV

Cowden also challenges the district court's instructions to the jury as to the evidence necessary to prove that the checks were forged. The district court charged the jury that the Government had three alternative ways of establishing that the checks were falsely made or forged: 1) that neither Brennick nor anyone acting with his permission made the checks; 2) that the checks themselves were not genuine but rather an imitation by some unknown party; or 3) that no Jacob Weiner ever existed and his name was endorsed by someone else. Cowden argues that the third alternative theory is incorrect since a forged endorsement on a valid security does not make the security itself "forged" under section 2314, *Street v. United States,* 331 F.2d 151 (8th Cir. 1964), and, in any event, the endorsement by a fictitious payee can be a perfectly valid endorsement if the endorser is acting under authority of the maker.

■ In making this argument, Cowden is faced with the fact that he did not object to the instructions as given, Fed.R. Crim.P. 30, leaving him to argue "plain error", Fed.R.Crim.P. 52(b). The difficulties are formidable. The Government presented the opinion of an FBI laboratory expert that Brennick's signature on the two suspect checks had been traced, and that the check forms themselves had been copied, presumably from authentic checks, by means of an offset process. If this evidence, plus Brennick's own testimony that he did not execute the checks, is accepted, and there was no contrary evidence, the first two alternative theories would be dispositive; and it is scarcely clear in what respect the technical deficiencies now alleged in the third theory of the instruction would be relevant. To be sure, Brennick testified that he had, on occasion, written checks in payment of gambling debts to a mythical "George Peterson" or "Charles Peterson", these being names which Caesar's Palace is Las Vegas is said to provide for the benefit of customers who do not wish to write the true payee's name on their personal checks used to pay gambling debts.

But except for Cowden's unsupported speculation during cross-examination, and in closing argument, that the Weiner checks might possibly be checks of this nature, prepared by Brennick himself and purposefully made out to a fictitious payee, there was nothing whatever to indicate that the Weiner checks fell within this category. The evidence was all to the contrary. In such circumstances, a judge could scarcely be expected to know that the defendant would be concerned by that portion of the instruction now criticized; and, even if we assume that the instruction was deficient, it is still not apparent that any harm could have ensued. Plain error means something far more apparent and far more obviously damaging, than a buried technical mistake, if it was a mistake, of this character.

## V

■ Cowden also asserts error in the court's alleged failure to comply with 18 U.S.C. § 3501(a) which provides that if the trial judge has found that a confession[7] was voluntarily made and has admitted it in evidence, he

> "shall permit the jury to hear relevant evidence on the issue of voluntariness *and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."* [Emphasis supplied.]

Cowden's contention is that the judge should have instructed the jury as set forth in the italicized language, which he did not do. While no request was ever made, the second circuit has held it to be plain error to omit the instruction required by section 3501(a) in a case where there was significant conflicting evidence as to voluntariness. *United States v. Barry,* 518 F.2d 342 (2d Cir. 1975). We think, however, that the instruction requirement in section 3501(a) has to be read with the earlier admonition in the subsection that if the court admits a confession it "shall permit the jury to hear relevant evidence on the issue of voluntari-

ness". Here Cowden neither offered evidence to the jury indicating that he was challenging the voluntariness of his statements to Claus nor made a claim of involuntariness in the jury's presence. The only evidence before the jury which Cowden now points to as pertaining to voluntariness is found in several pages of cross-examination where Cowden asked Agent Claus if he (Cowden) had not said at the first interview "is that why you brought me down here, to arrest me?" and suggested that Claus had replied, "We don't do things like that without a warrant." The point, if it was a point, was not developed, nor did Cowden in the presence of the jury ever object to admission of the statements, nor argue that they were not voluntary.

■ Earlier in a *voir dire* out of the jury's presence, Cowden had objected to admission of his statements, and the judge had ruled that they were admissible, a ruling not appealed. Even then, Cowden's claim amounted to little more than that the statements were given in a "non-voluntary atmosphere". He did not deny Agent Claus's testimony that he was fully advised of his rights; he had not been in custody; and it appears that his lawyer was present at the second interview. Still, had Cowden thereafter pursued the issue of voluntariness before the jury, even on questionable grounds, we might feel differently about the court's duty to instruct under section 3501(a). But we do not read section 3501(a) as requiring a ritual instruction where no identifiable issue of voluntariness exists.

## VI

■ Cowden also alleges error in the district court's denial of his motion to strike from the indictment the phrase "also known as *Jerome Cohen*", which appeared just underneath defendant's name. Defendant's name was changed legally from Jerome Cohen to Jerome Fleet Cowden in 1940, and he claims that the citation of his former name was prejudicial surplusage. It is best to

---

**7.** Cowden's statements to FBI Agent Claus, to which Claus testified, were not full admissions of guilt but, taken with other evidence, were of a "self-incriminating" character, hence within the § 3501(e) definition of a confession.

avoid the use of an alias particularly where, as here, there seems to be no relevant purpose for including it in the indictment. *United States v. Wilkerson,* 456 F.2d 57 (6th Cir.), *cert. denied,* 408 U.S. 926, 92 S.Ct. 2506, 33 L.Ed.2d 337 (1972). The possibility of prejudice here, however, was cured by the district court's taping over of the alias, xeroxing the indictment with the alias thus deleted, and giving the jury only the xerox copy. Lastly, Cowden contends that the district court erred in permitting Brennick to testify at length as to his three prior contacts with Cowden. The district court, which has broad discretion in deciding the relevancy of such evidence, *see* Fed.R.Evid. 403, was entirely justified in admitting this evidence since the past contacts between Cowden and Brennick tended to show Cowden's knowledge of Brennick's liquid wealth, his close friendship with Reddall, and his resentment of Brennick, and also tended to suggest that if Cowden's story were true he probably would at least have thought to contact Reddall or Brennick at the time he came into possession of the checks, all factors relevant to the ultimate issue.

*Affirmed.*