**Isaac CAMACHO, et al.,**
**Plaintiffs, Appellants,**

v.

**AUTORIDAD de TELEFONOS de**
**PUERTO RICO, et al.,**
**Defendants, Appellees.**

No. 88–1583.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1989.
Decided Feb. 21, 1989.

---

Charles S. Hey–Maestre with whom Ro-
berto Roldan–Burgos, Instituto Puertorri-
queno de Derechos Civiles, Sara E. Rios,

Frank E. Deale, Center for Constitutional Rights, Peter Berkowitz and Jose Antonio Lugo were on brief for plaintiffs, appellants.

Jose Juan Nazario de la Rosa, Juan Santiago Nieves, and Nazario, Santiago, De Leon on brief for Concilio General de Trabajadores and Comite en Defensa Derechos Ciudadanos, Inc., amici curiae.

Lino J. Saldana with whom Saldana, Rey, Moran & Alvarado, Jay A. Garcia-Gregory, Francisco de Jesus Schuck, Maria del Carmen Taboas, Fiddler Gonzalez & Rodriguez, Carmen Irizarry de Dominguez, Daniel Dominguez and Dominguez & Totti were on brief for appellees Autoridad de Telefonos de Puerto Rico, Enrique Jimenez, Miguel D. Lausell and Pedro Galarza.

John C. Harrison, Civil Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Daniel F. Lopez–Romo, U.S. Atty., and John F. Cordes, Jr., were on brief for intervenor-appellee the U.S.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

SELYA, Circuit Judge.

We are asked to revisit a crossroads where the laws of the United States and Puerto Rico intersect. Having made the journey and inspected the terrain anew, we remain confident that our earlier survey of the intersection is accurate. Because that reaffirmation is dispositive of the most heralded point on this appeal, and because none of appellants' other initiatives have merit, we affirm the district court's dismissal of the action.

## I. TRAVEL OF THE CASE

On December 19, 1986, plaintiffs (appellants before us) filed their complaint in Puerto Rico Superior Court. They claimed, variously, to have made or received electronically-intercepted telephone calls in 1984–85.[1] Alleging that this wiretapping abridged their rights under local law, plaintiffs sought money damages and equitable relief. They named as defendants two quasi-public corporations, the Puerto Rico Telephone Authority (ATPR) and the Puerto Rico Telephone Company (PRTC), and certain officers and/or former officers of the companies.[2] The wiretapping, it was said, was accomplished by federal agents, with defendants' help.

Appellees removed the case to federal district court. Plaintiffs neither contested removal nor sought remand. The United States then moved to intervene as a defendant on the ground that the suit cast a cloud over the integrity of federal law enforcement efforts in the Commonwealth; the district court granted the motion. Eventually, the court entertained, and acted favorably upon, motions for dismissal, ruling that plaintiffs' complaint did not state any actionable claim. This appeal followed.

## II. FRAMEWORK

We offer a thumbnail sketch of certain statutory and constitutional enactments referred to by the parties, and then limn the issues presented on appeal.

### A. *Title III.*

By enacting the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, Tit. III, 82 Stat. 212, 18 U.S.C. §§ 2510–2520 (Title III), Congress acted affirmatively to regulate interception of telephonic communications. Title III provides that, under certain carefully controlled circumstances, law enforcement officers may seek federal court authorization for wiretaps, 18 U.S.C. § 2516, subject to a panoply

---

**1.** All plaintiffs hold themselves out as residents of Puerto Rico, and the challenged conduct is said to have occurred there. Most of them are defendants in a federal criminal case pending elsewhere, and sought unsuccessfully in that proceeding to suppress the fruits of the wiretaps here at issue. *See United States v. Gerena,* 649 F.Supp. 1183 (D.Conn.1986) (ruling on motion to suppress). Appellees do not contend that

*Gerena* creates a collateral estoppel, and we take no view of that possibility.

**2.** PRTC provides telephone service throughout Puerto Rico; ATPR manages PRTC's affairs. *See* P.R.Laws Ann. tit. 27, §§ 401–24. For ease in reference, we will generally refer to the two companies and the individuals affiliated with them simply as "defendants" or "appellees."

of prophylactic conditions, *see, e.g.,* 18 U.S. C. § 2518. If granted, judicial authorization for a wiretap may—and frequently does—direct telephone companies and other persons (*e.g.,* landlords) to cooperate in the interception. *See* 18 U.S.C. § 2518(4). The carrot which balances this stick is the statutory assurance that such persons, broadly speaking, will be exempted from the civil and criminal liability that might otherwise be a consequence of wiretapping. When the United States sought and received appellees' assistance, the exculpatory statute provided that:

> Notwithstanding any other law, communication common carriers, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire or oral communications [when furnished with a court order commanding such assistance]. * * * No cause of action shall lie in any court against any communication common carrier, its officers, employees, or agents, landlord, custodian, or other specified person for providing information, facilities, or assistance in accordance with the terms of an order or certification under this subparagraph.

18 U.S.C. § 2511(2)(a)(ii) (1982).

### B. *The Federal Relations Act.*

This court, and others, have written extensively about the roots of the relation between Puerto Rico and the United States, and about the interplay between the Puerto Rico Federal Relations Act, 48 U.S.C. § 731b *et seq.,* and the Puerto Rico Constitution. We see no need for further fossorial exercises aimed at repastinating that soil, especially since we find ourselves in broad agreement with the pre–1953 historical synopsis contained in *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A.,* 649 F.2d 36, 39–40 & nn. 7–19, 24 (1st Cir.1981), and with the following description of the shift in relations attendant upon the enactment of the federal enabling legislation:

In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens. As the Supreme Court has written, "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a State of the Union...." *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594 [96 S.Ct. 2264, 2277, 49 L.Ed.2d 65] (1976).

*Id.* at 41. *See also Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 671–672, 94 S.Ct. 2080, 2085–2086, 40 L.Ed.2d 452 (1974).

What is most relevant for our purposes is that the Federal Relations Act has a provision setting forth the effect of federal statutes in Puerto Rico. It states: "The statutory laws of the United States *not locally inapplicable,* except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States...." 48 U.S.C. § 734 (emphasis supplied).[3] The rub, as we shall see, lies in the underscored phrase.

### C. *The Puerto Rico Constitution.*

The Puerto Rico Constitution flatly prohibits wiretapping. P.R. Const. Art II, § 10. That prohibition is embedded, as well, in the fabric of the Commonwealth's laws and regulations. *See, e.g.,* P.R. Laws Ann. tit. 33, § 4187. By the same token, appellees operate under a legislative mandate that their customers "shall be able to enjoy the service offered [them] without

---

**3.** The omitted portions refer, inter alia, to certain exceptions, mainly involving tax and revenue measures. The parties concede that those exceptions are inapposite in this instance.

fear of interception...." P.R. Laws Ann. tit. 27, § 403(c)(1). In general, with allowances for a rhetorical flourish or two, we can agree with appellants that the "prohibition of wiretapping is an integral and indispensable part of the definition of Puerto Ricans as a people and a cornerstone of [Puerto Rico's] cultural values." Appellants' Brief at 6 (underscoring and excess capitalization eliminated).

### D. *Issues Presented.*

The district court dismissed plaintiffs' complaint because, in its view, the imperatives of Title III overrode the strictures of Puerto Rico law. *Camacho v. ATPR,* No. 87–0108 (PG), slip op. at 2–6 (D.P.R. Apr. 12, 1988). And, it held the defendants harmless from the suit by reason of the immunity conferred by 18 U.S.C. § 2511(2)(a)(ii). *Id.* at 6–10.

Appellants assign error in four respects. They urge (1) that their action was improperly removed from the superior court to the federal district court; (2) that Title III is "locally inapplicable" in Puerto Rico within the meaning of 48 U.S.C. § 734, at least in the circumstances at bar; (3) that, whether or not Title III has pertinence, appellees are not eligible for the statutory shield; and (4) that the district judge should have recused himself. We consider these issues *seriatim.*

## III. REMOVAL

■ Appellants' action was removed from the Puerto Rico Superior Court on divers grounds. One basis was 28 U.S.C. § 1442(a)(1), which provides in pertinent part as follows:

(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Any officer of the United States or any agency thereof, *or person acting under him,* for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals....

28 U.S.C. § 1442(a)(1) (emphasis supplied).[4]

Given the language of this statute, it seems surpassingly difficult to fault the removal. After all, the gravamen of the action was that defendants "wiretapped and/or offered technical assistance to federal agents to wiretap, and/or facilitated ... the wiretapping by federal agents of plaintiffs' calls." Plaintiffs' Complaint at ¶ 10. The removal petition averred that "at all times referred to in said complaint, codefendants ... were acting under express orders, control and directions of federal officers who were acting under color of their office as federal agents and in the performance of their official duties." This recital has never been contradicted. Nothing more was needed.

Appellees' involvement in the electronic surveillance was strictly and solely at federal behest. There is no reason to suppose that the agents were not engaged in official government business, that is, acting "under color of" their federal office. In such circumstances, the reach of section 1442(a)(1) extends to private persons, like appellees, who act under the direction of federal officers. *See, e.g., Peterson v. Blue Cross/Blue Shield,* 508 F.2d 55, 58 (5th Cir.) (suit properly removed under § 1442(a)(1) by private corporations which had acted as Medicare fiscal intermediaries), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975); *Texas v. National Bank of Commerce,* 290 F.2d 229, 231 (5th Cir.) (suit properly removed under § 1442(a)(1) by bank operating branch at military base under right granted by Treasury Secretary), *cert. denied,* 368 U.S. 832,

---

**4.** Although section 1442(a) refers to removal from "a State court," there is no doubt that it allows removal from the Commonwealth courts. Indeed, the Federal Relations Act specifically provides that "[t]he laws of the United States relating to ... removal of causes ... as between the courts of the United States and the courts of the several States shall govern in such matters ... as between the United States District Court for the District of Puerto Rico and the courts of Puerto Rico." 48 U.S.C. § 864.

82 S.Ct. 55, 7 L.Ed.2d 35 (1961). Nor is it a bar to removal that, in appellants' words, "plaintiffs' claim is a uniquely independent cause of action created by local Puerto Rican law and the Puerto Rican Constitution." Appellants' Reply Brief at 7. So long as section 1442(a)(1) encompasses the action, the right to remove is not vitiated even if the case necessitates the construction and interpretation of state or local law. *See, e.g., People of Puerto Rico v. Santos–Marrero,* 624 F.Supp. 308, 310–11 (D.P.R. 1985); *Arthur v. Fry,* 300 F.Supp. 620, 622 (E.D.Tenn.1969); *cf. Pueblo Int'l, Inc. v. De Cardona,* 725 F.2d 823, 826 (1st Cir. 1984) (removal and abstention are separate questions). After all, "the federal judicial system has the capacity to apply state law" where necessary to resolve questions within the district courts' jurisdiction. *United States v. Commonwealth of Puerto Rico,* 721 F.2d 832, 839 (1st Cir.1983). And in a very real sense, as we show *infra,* Puerto Rico law is not genuinely at issue in this proceeding. *Cf. Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (state law is to be applied "[e]xcept in matters governed by the Federal Constitution or by acts of Congress").

Statutes like section 1442(a)(1) represent a legislatively-spawned value judgment that a federal forum should be available when particular litigation implicates a cognizable federal interest. *Cf. Ely Valley Mines, Inc. v. Hartford Accident and Indemnity Co.,* 644 F.2d 1310, 1313 (9th Cir. 1981) (construing 28 U.S.C. § 1442(a)(3)). Justice Marshall, writing for a near-unanimous Court, agreed that "the removal statute is an incident of federal supremacy...." *Willingham v. Morgan,* 395 U.S. 402, 405, 89 S.Ct. 1813, 1815, 23 L.Ed.2d 396 (1969) (discussing section 1442(a)(1)). Therefore, it should not be read in a "narrow" or "limited" manner, *id.* at 406, 89 S.Ct. at 1815 (quoting *Colorado v. Symes,* 286 U.S. 510, 517, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932)), nor should the policy underlying it "be frustrated by a narrow, grudging interpretation...." *Id.* at 407,

89 S.Ct. at 1816. These principles, we think, are fully dispositive of the jurisdictional issue in this case. Only the most crabbed reading of section 1442(a)(1) could call the appropriateness of removal into question here. We refuse to interpret the statute in so unrealistic a way.[5]

## IV. APPLICABILITY OF TITLE III

■ The crown jewel in appellants' diadem is the argument that Title III is "locally inapplicable" within the purview of the Federal Relations Act, 48 U.S.C. § 734. Appellants point to an impressive collection of local connections: the wiretaps (1) occurred in Puerto Rico; (2) involved residents of Puerto Rico; (3) were facilitated by defendants—two quasi-public Commonwealth corporations and various "public servants," that is, individuals employed by PRTC and ATPR; and (4) implicate an area of the law—wiretapping—wherein the Commonwealth has unblinkingly declared its strong interest and announced an explicitly prohibitory policy, *see supra* Part II(C). Yet the argument conveys too little and arrives too late.

It is beyond cavil that Title III purports to displace conflicting state and local laws vis-a-vis wiretapping. 18 U.S.C. § 2511(2)(a)(ii) specifically provides that "[n]o cause of action shall lie in any court" against those who assist in the performance of a federal intercept. We have held—squarely and recently—that Title III applies in Puerto Rico with the same force and effect as in any of the fifty states. *United States v. Quinones,* 758 F.2d 40, 41–43 (1st Cir.1985); *accord United States v. Gerena,* 649 F.Supp. 1183, 1186–87 (D.Conn.1986); *United States v. Perez,* 465 F.Supp. 1284, 1285–86 (D.P.R.1979); *cf.* 18 U.S.C. § 2510(3) ("State" as used in Title III includes Puerto Rico); 18 U.S.C. § 2511(1)(b)(v) (Title III's general prohibition extends to persons acting in Puerto Rico). Mindful of the unbroken precedential line of march, we decline appellants' invitation to reenter this thicket.

---

**5.** In light of our conclusion that the case was appropriately removed under 28 U.S.C. § 1442(a)(1), we need not consider—and thus take no view of—the alternate grounds for removal outlined in defendants' petition.

We do not minimize the distinctions between this case and *Quinones:* this is civil litigation, no federal criminal prosecution is directly at stake, Puerto Rican public utilities have been sued, PRTC employees (the equivalent of government employees) facilitated the intercepts, etc. Yet those distinctions make no meaningful difference. As we see it, the sockdolager is this: Congress, with tax and revenue exceptions not material here, *see supra* note 3, retained full authority to treat Puerto Rico like a state subsequent to the advent of Commonwealth status. *Quinones,* 758 F.2d at 43; *Garcia v. Friesecke,* 597 F.2d 284, 293 n. 11 (1st Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979). And it accorded Puerto Rico precisely that treatment when it enacted Title III.

To be sure, the compact between the federal sovereign and the people of Puerto Rico confers a measure of autonomy on the Commonwealth akin to statehood—but it has never been read to bestow so great a degree of autonomy as to authorize the Commonwealth to escape the burdens of federal laws, not within specifically-excepted areas, *see supra* note 3, which Congress chooses equally to apply to Puerto Rico when it legislates for the Nation as a whole. The critical datum is not whether the Commonwealth approves of the law, or endorses its goals and values, or has enacted legal or constitutional provisions antithetic to it. What matters is that the terms and stipulations of Title III affect Puerto Rico in exactly the same manner as they affect the fifty states. The impetus for the law—the need to gather intelligence so as to enforce the federal criminal code—is a pervasive one; it is no less acute in the Commonwealth than on the mainland. Given the nature, scope, composition, and thrust of Title III, its use in Puerto Rico is fully consistent with the compact. *Compare, e.g., Caribtow Corp. v. OSHRC,* 493 F.2d 1064, 1065–68 & nn. 2–10 (1st Cir.) (Occupational Safety and Health Act applicable in Puerto Rico), *cert. denied,* 419 U.S. 830, 95 S.Ct. 52, 42 L.Ed.2d 55 (1974); *Moreno Rios v. United States,* 256 F.2d 68, 71–73 (1st Cir.1958) (Narcotic Drug Import and Export Act applicable in Puerto Rico).

Inasmuch as Congress clearly had power to make Title III effective in Puerto Rico, and unmistakably exercised that power, no question remains. The act cannot be regarded as "locally inapplicable." P.R. Const. Art. II, § 10, on the other hand, is utterly inconsistent with, and stands as an obstacle to the due operation of, the federal law. To permit Puerto Rico—or a state, for that matter—so dramatically to undercut the immunity conferred by section 2511(2)(a)(ii) would be to sabotage a vital cog in the machinery of Title III. Accordingly, the federal statute must prevail. *See Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 108 S.Ct. 1350, 1353, 99 L.Ed.2d 582 (1988) (despite Puerto Rico's "unique status in our federal system ... the test for federal pre-emption of the law of Puerto Rico ... is the same as ... for pre-emption of the law of a State").

## V. ELIGIBILITY FOR PROTECTION

█ Plaintiffs next say that even if Title III has effect within the Commonwealth, PRTC is not a "communication common carrier" under 18 U.S.C. § 2511(2)(a)(ii), quoted *supra* Part II(B), and thus appellees cannot claim immunity from civil suits. The dialectic, we concede, is an ingenious one—but once placed in proper perspective, it withers. We set the stage.

When the intercepts in question were performed, section 2511(2)(a)(ii) specifically mentioned "communication common carriers," ascribing to that term "the same meaning which is given the term 'common carrier' by [the Communications Act, 47 U.S.C. § 153(h)]." 18 U.S.C. § 2510(10).[6] Plaintiffs contend that PRTC is not such a "common carrier," but is instead a "connecting carrier," as defined in 47 U.S.C.

---

**6.** The Electronic Communications Privacy Act of 1986 amended the statute's operative language—after the events here at issue had transpired—to replace "communication common carriers" with a more expansive reference, viz., "providers of wire or electronic communication service." Pub.L. No. 99–508, § 101(c)(6), 100 Stat. 1851 (1986). In all other material respects, the language of section 2511(2)(a)(ii) was left undisturbed.

§ 153(u). That the two entities differ to some extent in the eyes of the law, and that the difference may affect liability in some instances, is not much in doubt. *See, e.g., Comtronics Inc. v. PRTC*, 553 F.2d 701, 704–07 (1st Cir.1977) (distinguishing between "common" and "connecting" carriers for purpose of damages remedy under 47 U.S.C. § 206, and classifying PRTC in the latter category). Confronted with the argument that a "connecting carrier" was not a "common carrier" within the purview of section 2511(2)(a)(ii), the district court agreed that "a strictly literal interpretation ... would ... have excluded [defendants] from [Title III's] protection." *Camacho*, slip op. at 7. The court reasoned, however, that the 1986 amendment, *see supra* note 6, had an abstersive effect, "clarif[ying] the protection of [Title III]," *Camacho*, slip op. at 9; and that the clarification "leads ... to [the] conclu[sion] that PRTC was a 'common carrier' when plaintiffs' conversations were allegedly wiretapped and, therefore, defendants ... were free from any liability under the Act as it then read." *Id.* at 10.

We see no need to pass upon the district court's conceptualization or otherwise to address appellees' asseveration that a "connecting carrier" is indeed a "common carrier" within the ambit of Title III. We avail ourselves instead of an independently sufficient ground which has the same practical effect. Our ability to chart our own course in this fashion is indisputable. *See Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1349 (1st Cir.1988) (appellate court "not wed to ... trial court's reasoning" but free to affirm on alternate ground) (listing illustrative First Circuit cases); *Pueblo Int'l*, 725 F.2d at 825 (similar).

In this case, appellants admit that all of the defendants cooperated in the wiretapping effort pursuant to a federal court order. In the 1984–85 time frame (when the electronic surveillance occurred), section 2511(2)(a)(ii) authorized four categories of helpmeets to assist the implementation of court-ordered wiretaps: (1) "communication common carriers," and the "officers, employees, or agents" of such carriers; (2) "landlords"; (3) "custodians"; and (4) "other persons." The statute bestowed immunity upon all four groups. It is the fourth category which, we think, draws the grease from the goose. Title III has consistently defined the word "person" to include artificial persons (corporations) as well as individuals. 18 U.S.C. § 2510(6). Thus, nothing turns on whether or not PRTC is a "communication common carrier": if PRTC qualifies, then it, and the individual defendants as its "officers, employees, or agents," are immune from plaintiffs' action; if not, the defendants are nonetheless "other persons" within the catchall category of the statute, ergo, immune.

Not only does this reading of section 2511(2)(a)(ii) track the unambiguous language of the statute, but it comports with the discoverable intendment of the Congress. Title III's "other persons" exemption was crafted by the Foreign Intelligence Surveillance Act of 1978, Pub.L. No. 95–511, § 201(a), 92 Stat. 1796–1797. Prior thereto, the exemption was much more exiguous: "It shall not be unlawful ... for any officer, employee, or agent of any communication common carrier to provide information, facilities, or technical assistance" to law enforcement personnel engaged in court-sanctioned wiretapping. 18 U.S.C. § 2511(2)(a)(ii) (1976). In gauging the significance of the broadened language, we find the legislative history of the 1978 amendments to be revealing. The revision was designed to "include 'landlords, custodians, or other persons' in the authorization," require the government to deliver a copy of the judge's order to the assister, and "relieve such person from all civil liability for actions in conformance with the court order...." H.R.Rep. 1283, 95th Cong., 2d Sess. 98–99 (1978). The Conference Committee report on the final version of the bill explained that the conferees had adopted the House provision so as to "afford[ ] civil immunity to *any person* who provides such assistance in accordance with a court order...." H.R.Conf.Rep. No. 1720, 95th Cong., 2d Sess. 35, *reprinted in* 1978 U.S.Code Cong. & Admin.News 3904, 4048, 4064 (emphasis supplied). We can conceive no plausible reason why Congress would have wanted to exclude connecting

carriers, or their employees, from the coverage of the wide net which it purposefully cast.

In sum, then, three things coalesce: the language of section 2511(2)(a)(ii), as it read at the times material to our inquiry, the discernible intent of the Congress, and simple logic. All conduce to the view that the catchall "other persons" classification sweeps broadly. So construed, it plainly extends to appellees, irrespective of PRTC's "common carrier" status. In the matter of an assister's immunity under Title III, all roads lead to Rome.

## VI. RECUSAL

Twice during the proceedings below, plaintiffs moved pursuant to 28 U.S.C. § 455(a) to excuse Chief Judge Perez–Gimenez.[7] The initial motion made a host of interrelated charges, which boil down to a pair: (1) that the judge had issued some (or all) of the orders authorizing the electronic surveillance and thus had "prior knowledge of the facts ... which tainted his view...." Appellants' Brief at 45; and (2) that the plaintiffs had publicly attacked the judge's integrity in the course of suppression hearings in the related criminal prosecution. The second recusal motion added yet another twist: plaintiffs adverted to one or more "pro-statehood" speeches made by the judge, and contended that public expression of these political views "shatter[ed] any possible appearance of impartiality." Id. at 46. The district court denied both motions in a written opinion. Camacho Negron v. ATPR, No. 87–0108 (PG), slip op. (D.P.R. Nov. 6, 1987). The court found "none of [plaintiffs'] claims sufficient to prompt ... disqualification," id. at 2, and observed that, under the circumstances, recusal "would be tantamount to granting plaintiffs a veto power permitting them to have their case tried by the judge of their choice." Id. at 5.

■ We need not tarry in these precincts. Here, the judge performed no fact-

finding and exercised no discretion. He determined as a matter of law that plaintiffs' complaint was insufficient. A court of appeals reviews such determinations de novo. Since we have independently confirmed the correctness of the lower court's decision, see supra Parts III–V, the judge's refusal to recuse himself was, at worst, harmless error. Therefore, the matter of disqualification is moot. Cf. Fed.R.Civ.P. 61 (court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). Lest there linger any question, however, we explain why there was no error at all. Recusal was not exigible.

The test for disqualification under section 455(a) is straightforward: "whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant ..., but rather in the mind of the reasonable man." United States v. Cowden, 545 F.2d 257, 265 (1st Cir.1976), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). We examine plaintiffs' three accusations through this prism, mindful that our oversight of a recusal motion's denial is limited to a search for abuse of discretion. See United States v. Giorgi, 840 F.2d 1022, 1034 (1st Cir.1988); United States v. Parrilla Bonilla, 626 F.2d 177, 179 (1st Cir. 1980); Blizard v. Frechette, 601 F.2d 1217, 1221 (1st Cir.1979).

■ 1. The mere fact that Judge Perez–Gimenez authorized some (or all) of the underlying intercepts, and had some familiarity with their subject matter, did not compel disqualification. Our system of justice does not require that judges be empty vessels, wholly ignorant of all of the antecedents of a case. See, e.g., In re Cooper, 821 F.2d 833, 844 (1st Cir.1987) (per curiam); In re M. Ibrahim Khan, P.S.C., 751 F.2d 162, 165 (6th Cir.1984); United States v. Mirkin, 649 F.2d 78, 82 (1st Cir.1981);

---

7. The statute states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Plaintiffs filed no supporting affi-

davit on either occasion, expressly disclaiming any intention of relying upon 28 U.S.C. § 144 (actual bias or prejudice basis for recusal).

*United States v. Cepeda Penes,* 577 F.2d 754, 756–58 (1st Cir.1978); *United States v. Patrick,* 542 F.2d 381, 390 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). The present suit involves neither the validity of the wiretaps nor the substance of the surveilled conversations; rather, it concerns the reach of Title III and its extension to PRTC's activities. Nothing about the fact that the judge signed the orders sought by federal officials would lead a reasonable person to question the jurist's impartiality.[8] *See United States v. Kelley,* 712 F.2d 884, 890–91 (1st Cir.1983) (fact that judge approved wiretap on party's attorney did not give rise to reasonable fears of partiality); *Union Independiente de Empleados de Servicios Legales v. Puerto Rico Legal Services, Inc.,* 550 F.Supp. 1109, 1111–12 (D.P.R. 1982) (similar); *United States v. Garramone,* 374 F.Supp. 256, 258 (E.D.Pa.1974) (that judge had authorized wiretap did not necessitate recusal); *cf., e.g., United States v. De la Fuente,* 548 F.2d 528, 541 (5th Cir.) (presiding at pretrial hearing to suppress wiretap evidence does not preclude judge from presiding at trial) (dicta), *cert. denied,* 431 U.S. 932, 434 U.S. 954, 97 S.Ct. 2640, 98 S.Ct. 479, 53 L.Ed.2d 249, 54 L.Ed.2d 312 (1977); *United States v. Foddrell,* 523 F.2d 86, 87 (2d Cir.) (per curiam) ("District Court properly refused to recuse itself on the ground that the trial judge had conducted an eleven day hearing on wiretapping," among other things), *cert. denied,* 423 U.S. 950, 96 S.Ct. 370, 46 L.Ed.2d 286 (1975).

2. The charges made against the judge in the course of appellants' attempt to bar the prosecutor from using wiretap evidence are likewise insufficient to mandate disqualification. We have read the record carefully. The accusations were serious ones, delivered in a highly charged atmosphere and in colorful language. But a party cannot expect to jettison an unwanted judge merely by calling him names, loudly and in public, *see, e.g., United States v. Bray,* 546 F.2d 851, 858 (10th Cir.1976) ("The mere fact that a [party] has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced...."); and furthermore, "[a] judge lives in an atmosphere of strife, in which, by nature and experience, he is expected to be a man of 'fortitude.'" *In re Union Leader Corp.,* 292 F.2d 381, 389 (1st Cir.), *cert. denied,* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961) (quoting *Pennekamp v. Florida,* 328 U.S. 331, 349, 66 S.Ct. 1029, 1038, 90 L.Ed. 1295 (1946)). It behooves the courts to exercise due restraint before making the hurling of epithets a rewarding sport for litigants. In this case, we do not think section 455(a) required the judge to yield in the face of plaintiffs' uncomplimentary appraisal of him.

3. Appellants, who would prefer a relationship between Puerto Rico and the federal sovereign other than statehood, say that an appearance of bias was produced by one or more pro-statehood speeches given publicly by the judge. But the question of statehood has no bearing on this case; it is the relationship that exists—Puerto Rico's status as a commonwealth under the compact and the Federal Relations Act— not the one that might exist in the future, which informs the applicable rule of law. Our judicial system would be paralyzed if judges were disqualified from deciding cases because of views about, or differences over, abstract policy issues. The judge's views on Puerto Rico's future were, therefore, irrelevant to the case and to the matter of recusal. *See, e.g., United States v. Norton,* 700 F.2d 1072, 1076 (6th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983) (judge's expressed opposition to racism of Ku Klux Klan and Nazi Party does not necessitate disqualification notwithstanding that defendants are members of such groups); *Rosquist v. Soo Line R.R.,* 692 F.2d 1107, 1112 (7th Cir.1982) (judge's earlier writings on contingent fees do not preclude involve-

---

**8.** Insofar as *United States v. Zarowitz,* 326 F.Supp. 90, 93–94 (C.D.Cal.1971), much relied upon by appellants, holds to the contrary, we reject it. Although a judge's earlier issuance of wiretap orders might, with other facts and circumstances, militate toward recusal, we decline to adopt the *per se* rule which *Zarowitz* suggests.

ment in case concerning settlement which includes contingent fee); *Sidarma Societa Italiana di Armamento S.p.A. v. Holt Marine Industries*, 515 F.Supp. 1302, 1306–07 (S.D.N.Y.) (arbitrator's consideration of decision's effect on the overall industry not ground for disqualification despite likelihood that a given arbitrator's view of what is good for the industry will be colored by his personal business experiences), *aff'd*, 681 F.2d 802 (2d Cir.1981). No reasonable person could seriously have questioned Judge Perez–Gimenez's impartiality because of his generalized pro-statehood philosophy.

4. Appellants make one final pitch: they tell us that, even if items 1–3, taken severally, were insufficient to necessitate recusal, in the aggregate they compelled such a result. In this case, however, we can discern no such synergistic effect. Here, the whole is not greater than the sum of the parts. In combination, plaintiffs' points do not swell in importance. On the overall record, nothing required the judge to disqualify himself.

*Affirmed.*