COOL LIGHT COMPANY,
INC., Plaintiff,

v.

GTE PRODUCTS CORPORATION,
Defendant.

Civ. A. No. 86–2668–K.

United States District Court,
D. Massachusetts.

June 7, 1993.

Final Order Aug. 6, 1993.

Supplemental Memorandum Aug. 12, 1993.

Sydelle Pittas, Powers & Hall, Boston, MA, Arnold M. Stone, Stone & Rohatiner, Los Angeles, CA, Helen A. Robichaud, Palm-

er & Dodge, Boston, MA, Edwin A. McCabe, Joseph P. Davis, III, Karen Chinn Lyons, The McCabe Group, Cambridge, MA, for George Panagiotou and Cool Light Co., Inc.

James L. Ackerman, Day, Berry & Howard, Ann L. Palmieri, Carolan, Sullivan & Greeley, Boston, MA, John P. McNichols, Morgan, Wenzel & McNichols, Los Angeles, CA, Charles Donelan, Day, Berry & Howard, Boston, MA, Martha A. Finnegan, GTE Products Corp, Danvers, MA, Allan Van Gestel, Goodwin, Proctor & Hoar, Boston, MA, for GTE Products Corp.

## Memorandum and Order

KEETON, District Judge.

Plaintiff Cool Light Co., Inc. ("Cool Light") has moved for relief from the Final Judgment entered in this case in favor of GTE Products Corporation ("GTE") and from various orders that preceded the judgment.

Numerous submissions have been filed in accordance with a schedule set in a conference held on December 15, 1992.* After the scheduled period for submissions ended, Cool Light filed an additional motion and letter to the court, and the opposing parties filed further memoranda in response.**

Cool Light and one of the persons against whom it has made accusations of professional misconduct have requested hearings on their motions, pursuant to Local Rule 7.1(D). Having considered all memoranda and documents filed to date, I conclude that well established legal rules preclude the relief Cool Light seeks. A hearing to determine Cool Light's motion is therefore unnecessary. Additional issues raised by motions of the parties remain to be determined, however, and a conference will be held to set a schedule for submissions and argument on these matters.

## I. Factual Background of the Litigation

In the 1970's George Panagiotou began collaborating with Arthur Bodkins in Winthrop, Massachusetts, to produce a lighting system that would be cooler to work under than any lights then available. The cooler lights were based upon a design that allows visible light from a lamp to be reflected forward while a portion of the heat-intensive infrared rays are transmitted through the back of the light. By 1976, Panagiotou had

* Now before the court are the following submissions filed by Cool Light and others: (1) Motion of Cool Light for relief from orders and judgment and memorandum in support (Docket Nos. 242 and 243, filed Dec. 1, 1992); Memorandum of GTE in opposition (Docket No. 244, filed Dec. 14, 1992); Affidavit of Martha Ann Finnegan (Docket No. 245, filed Dec. 14, 1992); GTE's appendix of exhibits (Docket No. 246, filed Dec. 1992); (2) Motion of GTE to quash all deposition subpoenas and for entry of protective order (Docket No. 247, filed Dec. 14, 1992); Letter to the court from Edwin A. McCabe, re: def.'s motion to quash (Docket No. 248, filed Dec. 15, 1992); (3) Motion to quash subpoenas of Judge John J. McNaught, Elisabeth Medvedow, Mary Lou Moran, and Patricia Casey–Price (Docket No. 250, filed Dec. 15, 1992) and memorandum in support (Docket No. 252, filed Dec. 15, 1992); Letter to the court from Edwin A. McCabe updating previous letter (Docket No. 253, filed Dec. 15, 1992); (4) Motion of Ann L. Palmieri to quash deposition subpoena and for protective order, affidavit, and memorandum in support (Docket Nos. 255, 256, and 257, filed Dec. 15, 1992); (5) Motion of Charles Donelan to quash subpoena and memorandum in support (Docket Nos. 258 and 259, filed Dec. 15, 1992); (6) Motion of Cool Light seeking permission to interview jurors (Docket No. 261, filed Dec. 22, 1992);

Memorandum of Cool Light in opposition to all motions seeking to limit or prevent discovery (Docket No. 262, filed Dec. 22, 1992); Cool Light's reply to GTE's opposition (Docket No. 262, filed Dec. 22, 1992); Supplemental memorandum of GTE (Docket No. 264, filed Dec. 22, 1992); Further supplemental memorandum of GTE (Docket No. 265, filed Jan. 7, 1993); Reply memorandum in support of motion of Charles Donelan to quash subpoena (Docket No. 266, filed Jan. 7, 1993); Reply of Cool Light in support of motion for relief from orders and judgment (Docket No. 267, filed Jan. 7, 1993).

** (7) Plaintiff's motion for appointment of a magistrate judge as Special Master (Docket No. 270, filed Jan. 28, 1993); Letter to the court from Edwin A. McCabe re: status of motion to interview jurors (Docket No. 269, filed Jan. 28, 1993); GTE's additional opposition to plaintiff's motion seeking permission to interview jurors (Docket No. 271, filed Jan. 29, 1993); Opposition of Charles Donelan to plaintiff's request to interview jurors and motion for appointment of a magistrate judge as Special Master (Docket No. 272, filed Feb. 4, 1993); Opposition of defendant GTE to plaintiff's motion for appointment of a magistrate judge as Special Master (Docket No. 272, filed Feb. 5, 1993); and Letter from Patricia M. Russotto to Judge Keeton (Docket No. 274, filed Feb. 17, 1993).

decided to take the cool lighting idea to Hollywood to benefit from the concentrated market for such lights he hoped to find there. In 1977, Panagiotou and others incorporated the Cool Light Company.

Cool Light began in a small plant where lights were assembled by hand. Each light consisted of a fixture, a lamp, and a coated reflector. The lamps Cool Light used were standard tungsten-halogen lamps readily available at all relevant times. The Cool Light fixtures were also industry standard at first, although Panagiotou made improvements to the fixtures over the course of time. The principal claimed advantages of Cool Light fixtures were that they were more "user-friendly" and accessible than those available from other sources in the market place, and were more economical to use.

The reflectors were primarily what made the Cool Light products special. In the beginning, the company's source of supply of reflectors was the Liberty Mirror division of Libby–Owens–Ford Corporation and a man who worked there, Dwight Barkley. In 1978, a representative of defendant GTE, William Staubitz, approached Panagiotou and urged him to enter into a relationship with GTE for the purpose of obtaining the necessary reflectors for Cool Light. Meetings were arranged among Panagiotou, Staubitz, and another executive of GTE, Henry Hidler. The first meeting took place at Logan Airport in the fall of 1978. A second meeting took place later at GTE's coating facility in Massachusetts as Panagiotou explored the ability of GTE to make the necessary coated reflectors.

Eventually, Cool Light and GTE began working together to try to make reflectors for Cool Light's products. At first, GTE had a difficult time trying to produce reflectors that satisfied Panagiotou, but by September of 1980 enough progress had been made that Cool Light placed its first purchase order. The long uphill climb to that stage having ended, a rapid decline in the business relationship between Cool Light and GTE began. Although two additional purchase orders were placed, Cool Light received few reflectors that were satisfactory to Panagiotou. At the same time, Cool Light fell behind in its payments to creditors, including GTE. The business relationship quickly soured. Panagiotou was unable to pay his existing trade debts without the reflectors he needed to make his product, and GTE was unwilling to provide more reflectors without payment on pre-existing debts. In the end, Cool Light sold off much of its stock to pay creditors and quickly ceased doing any active business.

## II. Procedural Background

This case was originally tried before Judge McNaught and a jury in June 1990. In that trial, Cool Light presented five counts to the bench: Count III (Breach of Fiduciary Duty), Count VII (Unjust Enrichment), Count VIII (Constructive Trust), Count IX (Unfair and Deceptive Trade Practices [Mass.Gen.L. ch. 93A]), and Count X (Unfair Competition [California Business and Professional Code, Sec. 17200]). Judge McNaught ruled in favor of GTE on each of these claims. Count II was withdrawn before trial.

The court submitted to the jury sixteen special interrogatories as well as a general verdict form for each count and for the counterclaim.

On the special interrogatory form, the jury found, *inter alia:* (1) GTE had made a false representation to Cool Light that it could produce the number and quality of reflectors required, (2) Cool Light relied upon that misrepresentation, (3) Cool Light and GTE had both an oral and written agreement, and (4) GTE's actions cost Cool Light $9.3 million in loss of potential profits. The general verdict forms, however, indicated that Cool Light was due $3.694 million on the breach of contract claim, $2.8 million on the breach of implied covenant of good faith claim, and $9.45 million on the fraud claim. After the jury returned the verdict and special interrogatories, the court sent the jury back into the jury room to decide how much, if any, of the fraud damages were punitive. The jury returned with the answer that $2.95 million were compensatory in nature and $6.5 million represented punitive damages permitted under California law.

*Cool Light Co., Inc. v. GTE Products Corp.,*
973 F.2d 31, 32–33 (1st Cir.1992).

The jury found against Cool Light on Count I (Misappropriation of a Trade Secret and Confidential Information), Count IV (Mass.Gen.L. c. 93, Sec. 42 ["Taking of a Trade Secret"] ), and Count V (Misappropriation of Information). The jury found against GTE on its counterclaim.

On August 2, 1990, Judge McNaught held a post-trial conference. He expressed concern that the jury's awards totaling $9.444 million in compensatory damages did not square with the jury's answer to special interrogatory number 14 in which it stated that plaintiff had suffered a total of $9.3 million in lost profits as a result of defendant's conduct. Plaintiff argued that the $144,000 discrepancy between the total amount of compensatory damages awarded by the jury and its calculation of total lost profits represented additional compensatory damages, other than lost profits, awarded by the jury on Count XI (the contract claim).

In addition, Judge McNaught stated at the August 2, 1990 conference that he was concerned that the jury might have awarded multiple damages for the same harm, and that he had difficulty understanding how the jury could have awarded different amounts of damages for Counts VI, XI, and XII for what he viewed to be essentially the same harm.

At the August 2, 1990 conference, Judge McNaught and counsel for the parties discussed defendant's motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. The stated grounds for the motion for judgment notwithstanding the verdict were that there was insufficient evidence to support the jury verdict and that the punitive damages award was not permitted under Massachusetts law, the law that defendant contended governed the case. The grounds for the alternative motion for new trial were: (1) that the court omitted a necessary instruction regarding damages, (2) that the verdict was against the clear weight of the evidence, (3) that the damages awarded were excessive, and (4) that plaintiff was awarded multiple damages for the same injury.

On August 9, 1990, Judge McNaught issued a Memorandum and Order in which he ordered a new trial on all counts tried to the jury, including the counts on which GTE prevailed. The Memorandum and Order does not explicitly state any one specific ground for the order of new trial, but it does disclose that Judge McNaught was troubled by numerous aspects of the jury verdict.

I considered granting judgment non obstante veredicto on one or more of the counts of the complaint which were given to the jury for determination, and decided against it, since, if a new trial is granted, new evidence might be offered. There is also the fact that even if I act in that fashion, we are still left to speculate concerning the award of damages, the source of the amounts decided upon by the jury, and the possibilities that the jury came up with inconsistent amounts, or amounts that were divided among the counts improperly.

In sum, one must speculate in order to assess the work of the jury.

*Cool Light Co., Inc. v. GTE Products Corp.,* No. 86–2668–Mc at 4–5, 1990 WL 430757 (D.Mass. Aug. 9, 1990) (Memorandum and Order on proposed orders of judgment and on motion for judgment n.o.v.). Judge McNaught did not include the counts tried to the bench in the order for a new trial.

Plaintiff moved for reconsideration of Judge McNaught's order. Judge McNaught denied the motion. *Cool Light Co., Inc. v. GTE Products Corp.,* No. 86–2668–Mc (D.Mass. Aug. 29, 1990) (Order denying motion for reconsideration, McNaught, J.). Plaintiff then filed a petition for a writ of mandamus in the Court of Appeals for the First Circuit. The First Circuit denied the petition. *In Re: Cool Light Co., Inc.,* No. 90–1889, 1990 WL 254046 (1st Cir. Oct. 22, 1990) (noting that an order for a new trial is interlocutory in nature and that the litigant would be free to seek review of Judge McNaught's order on direct appeal, after final judgment was entered).

After Judge McNaught's retirement, the case was reassigned to me by random draw.

Plaintiff again moved for reconsideration of Judge McNaught's order for a new trial. After reviewing the submissions and the rec-

ord relating to Judge McNaught's issuance of the order for a new trial, I concluded that plaintiff had not made a sufficient showing that Judge McNaught had abused his discretion in ordering a new trial. *Cool Light Co., Inc. v. GTE Products Corp.,* No. 86–2668–K at 4–5, 1991 WL 415547 (D.Mass. July 25, 1991) (Memorandum and Order) (citation omitted).

Thereafter, plaintiff waived new trial as to counts I, IV, and V, electing to try only counts VI, XI, XII, and GTE's counterclaim. Plaintiff also waived its right to a jury trial. The parties stipulated that certain witnesses would testify, and that the court would make findings and conclusions of law based on an overall appraisal of all parts of the record of the first trial that the parties chose to include in the record for the second trial, plus any additional evidence the parties presented. The second trial concluded on October 31, 1991.

At the new trial, after consideration of all the evidence presented (including almost the entire record of the previous trial), I reached findings and conclusions, on several independent grounds, that GTE was not liable to Cool Light. *Cool Light Co. v. GTE Products Corp.,* No. 86–2668–K, 1991 WL 417527 (D.Mass. Dec. 11, 1991) (Opinion). In summary, I found that Cool Light had not sustained its burden of proof relating to breach of contract, fraud, or breach of implied covenant of good faith and fair dealing, and found Cool Light's evidence as to loss of profits to be entirely speculative. I ordered Final Judgment against Cool Light on all counts and dismissed GTE's counterclaim.

Plaintiff elected to appeal only Judge McNaught's decision to vacate the jury verdict and grant a new trial.

The Court of Appeals for the First Circuit affirmed. *Cool Light Co., Inc. v. GTE Products Corp.,* 973 F.2d 31 (1st Cir.1992). The appellate court reviewed in considerable detail Judge McNaught's decision and found that, based on the inconsistency of the jury's verdicts, Judge McNaught's decision to order a new trial was appropriate. *See Id.* at 35–36. The appellate court also denied Cool Light's subsequent petition for rehearing or rehearing en banc. *Cool Light Co., Inc. v.*

*GTE Products Corp.,* No. 92–1082 (1st Cir. Oct. 15, 1992).

Plaintiff now moves for relief from the Final Judgment entered after the second trial and from various orders entered by Judge McNaught, including his order for a new trial. Cool Light requests (1) reconsideration of the counts tried to the bench before Judge McNaught; (2) reconsideration of GTE's motion for judgment n.o.v., Judge McNaught's order for a new trial, and the final judgment entered after the second trial; and (3) reinstatement of the jury verdict. (Cool Light's mem. in supp. of mot. for relief at 13.)

## III. Prerequisites to Post–Judgment Relief

Cool Light seeks post-judgment relief based upon a claim of alleged improper failure of Judge McNaught (the trial judge to whom this case was originally assigned) to recuse himself because of bias against George Panagiotou, the principal officer and agent of Cool Light.

Cool Light also seeks discovery to develop support not only for this claim but as well to support far more serious accusations Cool Light makes against Judge McNaught, as the trial judge, and against attorneys for GTE, as officers of this court, with respect to allegedly unprofessional conduct while the jury trial was in progress.

On the record now before the court, including all submissions filed under the schedule set by the court, these accusations are not supported by evidence. Cool Light has, in effect, taken the position that in order to determine whether it can develop factual support for its accusations, it should be allowed to take depositions of Judge McNaught, persons who were part of his staff at the time of the jury trial, jurors, and persons who served as attorneys for GTE during the jury trial. Also, Cool Light proffers the affidavit of its lead counsel as a witness in this proceeding, while he continues to serve as Cool Light's lead counsel. And Cool Light requests that an evidentiary hearing be scheduled before this court during which Cool Light might call all of these persons as witnesses.

Cool Light has not called attention to any precedent for allowing such an extraordinary request, and I am aware of none.

In these circumstances, I conclude that, before allowing any form of discovery or court proceedings addressing the merits of Cool Light's accusations of misconduct, the court must first consider whether Cool Light has made a proffer sufficient to meet the prerequisites of a prima facie showing sufficient, factually and legally, to support relief. *See In re United States,* 666 F.2d 690, 695 (1st Cir.1981) ("a charge of partiality must be supported by a factual basis") (citations omitted); *cf. Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 527–28 (1st Cir. 1991) (noting the requesting party's "duty to lay a foundation for a[n evidentiary] hearing" on a motion for attorney's fees).

Precedents directly bearing upon an extraordinary request such as Cool Light makes are limited, but precedents in analogous contexts support the conclusion I draw from *In re United States, supra.* One analogy is to charges of misconduct against law enforcement officers. *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) ("To mandate an evidentiary hearing [concerning the validity of affidavit supporting search warrant], the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.... [A]llegations must be accompanied by an offer of proof."); *Copp v. United States,* 968 F.2d 1435, 1438 n. 1 (1st Cir.1992) (noting that it is not an abuse of discretion for a district court to deny a request for an evidentiary hearing to question the propriety of an IRS summons if the taxpayer has not made a sufficient threshold showing of improper purpose). *See also United States v. LaRouche Campaign,* 682 F.Supp. 610, 621–22 (D.Mass. 1987) (outlining a set of questions that may be considered by the trial court in evaluating requests for evidentiary hearings during pretrial proceedings in criminal cases).

Absent a prima facie showing of a factual and legal basis for relief the court would be authorized to grant if the prima facie showing were credited, factually and legally, after full hearing, allowing the court's processes to be used for further proceedings on Cool Light's motion for relief from the final judgment and from orders that preceded the judgment would be unjust both to other parties to this proceeding and to the parties to other cases on the court's docket, the consideration of which would necessarily be delayed by the commitment of court resources to further proceedings in this case. *Cf. In re United States,* 666 F.2d at 695 (if less than factually supported bases for recusal were required, "a judge could abdicate on difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias") (citation omitted).

Cool Light asserts that, in accordance with 28 U.S.C. 455(a) and (b), Judge McNaught had a duty to recuse himself and, furthermore, that his failure to do so tainted the proceedings over which he presided. As remedy Cool Light seeks reinstatement of the jury verdict in the first trial, or in the alternative a new trial. I turn first to additional factual background and then, in Part V, to the prerequisites to any relief that this court might be authorized to grant to Cool Light.

## IV. Additional Factual Background Bearing Upon the Motion for Relief

As a basis for its motion for relief, Cool Light makes first, a claim that Judge McNaught should have recused himself for bias. In support of this claim, Cool Light alleges that, on June 29, 1990, after Judge McNaught adjourned the jury trial, he spoke with the jurors in chambers. During that conversation, according to affidavits of four jurors submitted by Cool Light, Judge McNaught told the jurors that he disagreed with the jury's verdict in favor of Cool Light and mentioned that the president of Cool Light, who was also plaintiff's key witness, was involved with drugs. (W. Koerner Aff. ¶ 6; M. Fischer Aff. ¶ 4; R. Swift Aff. ¶ 4; J. Livesey Aff. ¶ 4.)

Cool Light provides the following account of how it learned of this alleged post-trial conversation between the judge and jurors. On September 9, 1993, more than two years after Judge McNaught ordered a new trial

and nine months after final judgment was entered, Cool Light's president George Panagiotou telephoned jury foreperson William Koerner and asked Koerner to call Cool Light's counsel Edwin A. McCabe. Nothing in the record explains what prompted Panagiotou to call Koerner. Nor does Cool Light provide details of this conversation.

Koerner affirms that he "was pleased to hear from Mr. Panagiotou, and promptly did as he requested." (W. Koerner Aff. ¶ 2.) Koerner states that this was the first communication of any kind between Koerner and Panagiotou. *Id.*

According to attorney McCabe, Koerner called him at his home on September 9, 1992. (E. McCabe Aff. ¶ 3.) McCabe states that during this conversation, Koerner "expressed his concern that the jury's work for six weeks had been nullified by Judge McNaught's grant of a new trial," and disclosed the contents of letters exchanged between Koerner and Judge McNaught after the new trial was ordered. (E. McCabe Aff. ¶ 2.)

Koerner had written to Judge McNaught to express his concern about the order for a new trial and asked for an explanation. (*See* Letter from W. Koerner to Judge McNaught, dated Sept. 10, 1990, attached to Cool Light's Motion for Relief as exh. A.) In response, Judge McNaught had written to Koerner, explaining that it would be inappropriate for the judge to comment further on the case and enclosed a copy of his August 9, 1990 Memorandum and Order. (*See* Letter from Judge McNaught to W. Koerner, dated Sept. 11, 1990, attached to Cool Light's Motion for Relief as exh. A.) In his communication with Judge McNaught, Koerner did not express concerns about the comments that Judge McNaught had allegedly made to the jurors after the trial.

McCabe avers that he did not learn of Judge McNaught's alleged statements to the jurors until Koerner's second telephone call on September 29, 1992 (E. McCabe Aff. ¶ 2). McCabe states that soon after his conversation with Koerner, he received a call from another juror, Janet Livesey, "who had apparently been prompted by Koerner." (E. McCabe Aff. ¶ 6.) McCabe avers that Live-

sey "essentially confirmed" what Koerner had told him about Judge McNaught's post-verdict comments, and added a few more details.

McCabe states that when he received the second call from Koerner and the call from Livesey, he was home convalescing from throat surgery. (E. McCabe 2d Aff. ¶ 8.) According to McCabe he did not return to work "full-time" until October 13, 1992. (*Id.* ¶ 8.)

McCabe states that, after hearing from Koerner and Livesey, and apparently after returning to work full-time, he learned the details of Panagiotou's 1976 arrest, indictment, and the subsequent dismissal of the indictment. He states that he located and read the official court file that had been sent to a storage facility in 1981. (E. McCabe Aff. ¶ 9.)

According to the affidavits submitted in support of plaintiff's motion, two more jurors, allegedly prompted also by Koerner, made contact with and provided information to McCabe. (*See* R. Swift Aff. and M. Fischer Aff., attached to Cool Light's motion for relief as exhs. C and B.)

From late September through late November, 1992, McCabe avers that he spent two months in two related activities—first, conducting research regarding the information McCabe had received, allegedly unsolicited by him, from the four jurors and, second, preparing their affidavits for signature. (E. McCabe 2d Aff. ¶ 16; *see also* W. Koerner Aff. ¶ 2, J. Livesey Aff. ¶ 2, M. Fischer Aff. ¶ 2, and R. Swift Aff. ¶ 2 (attesting that the affidavits were "prepared and executed at the request of counsel for the plaintiff, Cool Light Company, Inc.").)

At no time before filing its motion with this court on December 1, 1992, did Cool Light seek leave of the court to correspond or talk with the jurors.

### V. Judicial Recusal

#### A. A Judge's Duty of Recusal and a Litigant's Remedies

■ Precedents interpreting the recusal statute as applied to trial judges establish that ordinarily the judge whose duty of recusal is in question must be the first to pass on

whether recusal is required under § 455. *See United States v. Chantal*, 902 F.2d 1018, 1024 (1st Cir.1990). The usual rule does not apply here, however, in view of Judge McNaught's retirement. In these circumstances, I conclude that as the trial judge to whom this case was drawn on Judge McNaught's retirement, I must make the initial determination of whether recusal was required.

■ The standard that the subsequently-assigned trial judge applies in making this first-instance determination regarding recusal may differ in one sense from that the originally-assigned trial judge would have been required to apply. The original decisionmaker would come to the matter with knowledge beyond that the later-assigned decisionmaker has. The statute may be interpreted as requiring the original decisionmaker to take that knowledge into account, at least if doing so would tend to favor recusal. In contrast, the later-assigned decisionmaker must consider the matter on the basis of evidence received in the proceeding seeking relief for the failure of the original decisionmaker to recuse himself. This contrast may have limited significance, however, if any at all, because even the original decisionmaker must apply an objective standard of judgment—whether "his impartiality might reasonably be questioned"—rather than his own "subjective" view about his impartiality. For this reason, the later-assigned decisionmaker in the circumstances presented here, in making this first-instance determination about another judge's duty of recusal, must apply this objective standard—whether the original judge's "impartiality might reasonably be questioned." *See, e.g., United States v. Cowden*, 545 F.2d 257, 267 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977).

In some respects, the standard to be applied in considering possible grounds for recusal varies depending on which part of section 455 is involved—part (a) or part (b). I turn first to part (b).

### 1. Disqualification under 28 U.S.C. § 455(b)(1).

■ Section 455(b)(1) calls for disqualification where a judge "has a personal bias or prejudice" concerning a party. The statute states:

> (b) He shall ... disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Unlike subsection (a), which is discussed below, subsection (b)(1) requires a showing of bias in fact. *Chantal*, 902 F.2d at 1023. Under § 455(b)(1), the "circumstances calling for disqualification must be personal in the sense that the source of bias/prejudice must arise out of extrajudicial, not judicial, proceedings." *Id.* If the prima facie showing is made, the judge must engage in factfinding and determine whether the facts would convince a reasonable person that bias exists. *Chantal*, 902 F.2d at 1022 (citation omitted).

■ Cool Light claims that Judge McNaught's alleged statements to the jury after the first trial created an appearance of bias, and are evidence, as well, of bias in fact. Part of the argument is, apparently, that the court should infer that Judge McNaught's findings and legal rulings against Cool Light are evidence of this bias. Precedents, however, do not favor such an inference. *See Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1460–62 (1st Cir.1992) (reviewing a judge's rulings and accompanying statements in the context of the entire litigation, and holding that the judge had not abused his discretion in denying the motion for recusal). "When a party loses calamitously, it may seem an easy excuse to blame the judge and impugn his fairness—but [the Court of Appeals for the First Circuit] is not prone to swallow sour grapes whole, without concrete evidence of spoliation." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076 (1st Cir.1989). I find that plaintiff has failed to make a proffer sufficient to constitute a prima facie showing that Judge McNaught was biased in fact.

Cool Light points to nothing in the course of the trial or pretrial proceedings that shows bias or prejudice in fact. The affidavit of one juror from the first trial includes assertions

that she had "a general impression that Judge McNaught ... was biased in favor of GTE" (M. Fischer Aff. ¶ 5, attached to plaintiff's mot. seeking relief from judgment). Even if admissible as evidence in this proceeding (an assumption contrary to my conclusion in Part VI below), these assertions by a juror of her conclusion are not an adequate factual basis for Cool Light's charge. *See Cotto v. United States*, 993 F.2d 274, 277–278 (1st Cir.1993) (noting that the court need not consider "unsubstantiated conclusions" in a Rule 60(b)(6) motion). Likewise, McCabe's unattributed allegation that an unnamed source overheard a conversation between Judge McNaught and unidentified court personnel, at some point during the trial, cannot serve as a basis for further proceedings with regard to an alleged violation of § 455(b). McCabe's failure to provide more specific information—regarding, for example, when this alleged conversation occurred, the identity of his source, or the circumstances that brought the alleged conversation to his attention—is a striking lack of disclosure when considered alongside the serious allegations he makes.

In summary, plaintiff having failed to make a prima facie showing of elements required under § 455(b)(1), there is no basis in the record before me for concluding that Judge McNaught had a duty to recuse himself for bias in fact, or for concluding that Cool Light has made a sufficient proffer to justify an evidentiary hearing on this subject.

### 2. *Disqualification under 28 U.S.C. 9455(a).*

"The test for disqualification under section 455(a) is straightforward: 'whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant ..., but rather in the mind of the reasonable [person].'" *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482 (1st Cir.1989) (quoting *Cowden*, 545 F.2d at 265).

28 U.S.C. § 455(a) states:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

"[S]ection 455(a) is automatic, mandatory and self-executing." *Chantal*, 902 F.2d at 1023. "[I]n the First Circuit, § 455(a) is an independent basis for mandatory disqualification which requires no determination of bias in fact." *Id.* Nor under § 455(a) does the source of the judges's statement matter. *Id.* at 1023–24. In making a determination in compliance with § 455(a), a judge must be aware, however, that the standard is *not* one of mere suspicion. *See In re Allied–Signal, Inc.*, 891 F.2d 967, 970 (1st Cir.1989), *cert. denied, ACW Airwall, Inc. v. United States Dist. Court for Dist. of Puerto Rico*, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990) (*Allied I* ) (more than suspicion is required "because the disqualification decision must reflect" a weighing of "the need to secure public confidence through proceedings that appear impartial" against the need to prevent a party "from too easily obtaining the disqualification of a judge, thereby manipulating the system for strategic reasons, perhaps to obtain a judge more to his liking").

I assume for present purposes that if admissible evidence were before the court to support findings consistent with all of plaintiff's allegations, a factual question would be presented as to whether a reasonable person might question the trial judge's impartiality. *See, e.g., Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (judge allegedly made anti-German remarks in a case involving German and German–American defendants); *Chantal*, 902 F.2d 1018 (1st Cir.1990) (judge made strong statements when previously sentencing defendant in connection with previous similar crime); *Roberts v. Bailar*, 625 F.2d 125 (6th Cir.1980) (recusal required where, in pretrial hearing on discrimination suit, judge remarked that he knew defendant to be an honorable man who would never intentionally discriminate against anyone). On the basis of this assumption, I look now to whether any of the relief sought by Cool Light in this proceeding could be granted if, after an evidentiary hearing, the court made findings that these factual allegations were supported by credible evidence.

## B. The Timeliness of Claim for Relief

█ In general, a party who acquires information supportive of a claim for mistrial or new trial is precluded from such relief if, rather than presenting the matter promptly to the court, the party awaits the outcome of the trial and then, after losing, for the first time moves for relief. *Cf.* Fed.R.Civ.P. 60(b) and 59(b) (timeliness provisions). In this case, were there not other grounds precluding the relief Cool Light seeks, it would be necessary to consider more closely the excuses proffered for Cool Light's filing this motion only after it had exhausted all avenues for claiming that final judgment should be entered on the jury verdict in the trial before Judge McNaught. *See Cotto,* 993 F.2d at 280 (1st Cir.1993), (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership,* —— U.S. ——, ——, 113 S.Ct. 1489, 1497, 123 L.Ed.2d 74 (1993) ("to justify relief under subsection (6), a party must show extraordinary circumstances suggesting that the party is faultless in the delay")). I need not, and do not, examine the issue further in this case in view of my conclusion that the relief sought must be denied on other grounds explained in Parts V.C and VI below.

## C. The Propriety of Retrospective Relief When Cool Light Already has Received Independent and Impartial Review of its Substantive Claims and of Judge McNaught's Order for a New Trial

█ "[W]here no actual bias is at issue, where the question is solely one of appearances, judicial actions already taken are not necessarily rendered invalid because of a circumstance that violates § 455(a)." *In re Allied–Signal Inc.,* 891 F.2d 974 (1st Cir.1989) (*Allied II* ). In fashioning retrospective relief, a court should do so with an eye toward accomplishing a just result. *Id.* at 976 (citing *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988)). Specifically,

in determining whether justice requires that a judgment be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Liljeberg,* 486 U.S. at 864, 108 S.Ct. at 2205.

Ordinarily the appropriate remedy for breach of a trial judge's duty of recusal is a new trial before a different judge. *Pontarelli v. Stone,* 978 F.2d 773, 775 (1st Cir.1992) ("If a trial judge has wrongly failed to disqualify him or herself, the remedy to correct this situation is for the appellate court to reverse the decision of the case on the merits and to order a new trial before a different judge."); *cf. Fashion House,* 892 F.2d at 1096 (noting in *dicta* that under the applicable local rules of the District of Rhode Island, the appellate court's remand of the case for retrial on other grounds would result in reassignment to a new trial judge, thereby rendering moot the attack on the trial judge's fairness and demeanor). *See also, Camacho,* 868 F.2d at 490 (the appellate court having "independently confirmed the correctness of the lower court's decision," the trial "judge's refusal to recuse himself was, at worst, harmless error" thereby rendering moot the matter of disqualification) (citation omitted).

Both this court and the First Circuit upheld Judge McNaught's order for a new trial, having determined, among other grounds, that the inconsistency in the general verdicts and awards of damages by the jury warranted new trial. *See Cool Light Co. v. GTE Products Corp.,* 973 F.2d 31 (1st Cir.1992).

Although these reviews were made on an abuse of discretion standard, both this court and the appellate court thoroughly examined Judge McNaught's decision to order a new trial. This court cited "numerous concerns" about the jury's inconsistent verdict and damages awards and concluded that Judge McNaught's decision to grant a new trial should stand. *Cool Light Co. v. GTE Products Corp.,* No. 86–2668–K, Memorandum and Order at 4–5, 1991 WL 415547 (D.Mass. July 25, 1991). The First Circuit upheld Judge McNaught's decision, concluding that the order was appropriate "where speculation and confusion are manifest in not only the verdict but the evidentiary record itself." *Cool Light Co.,* 973 F.2d at 36.

In the present proceeding I take account of the possible argument that a nondeferential review of Judge McNaught's order is required. I have therefore reconsidered under a *de novo* standard the submissions that were before me in support of Cool Light's motion for reconsideration of Judge McNaught's allowance of the motion for new trial and Cool Light's request that this court set aside Judge McNaught's order and enter a judgment based upon some or all of the jury's findings. In so doing, I have not gone back to identify and consider those parts of the record of the first trial that no party presented to me in any of the proceedings before me. Neither, however, has Cool Light called attention to anything in the record of the first trial that was not called to my attention in the record and yet could be material to my *de novo* review. I conclude that, when addressing the matter *"de novo"* (that is, independently and nondeferentially), I reach the conclusion that a new trial should have been granted. The primary grounds for this conclusion are the ambiguities and arguable inconsistency of findings of the jury and the insufficiency of the evidence to support the damages findings on any basis short of speculation. Judge McNaught's order for a new trial gave Cool Light the benefit of doubt about sufficiency of the evidence; it allowed new trial not only on the counts the jury resolved in Cool Light's favor but as well on other counts they resolved in favor of GTE, explicitly noting as well that new evidence might be offered by Cool Light at the new trial. *Cool Light Co., Inc. v. GTE Products Corp.*, No. 86-2668-Mc at 4–5, 1990 WL 430757 (D.Mass. Aug. 9, 1990) (Memorandum and Order on proposed orders of judgment and on motion for judgment n.o.v.).

Another independent basis for concluding at this time that either a judgment on the original verdict or another new trial in this case would be entirely inappropriate is that, even after Cool Light had a chance to offer additional evidence beyond that offered at the first trial, when I now make an independent review of the evidence offered in the two trials combined I conclude that the verdict should have been set aside and, at the least, a new trial should have been granted, if indeed the court did not instead order judgment for the defendant notwithstanding the verdict. During the second trial Cool Light had full notice of the court's concern about the sufficiency of the evidence on the critical causation issues in the case. As explained in my findings and conclusions, made after Cool Light's having presented additional evidence at its second opportunity, the combined evidence from the first and second trials failed to satisfy Cool Light's burden of proof on the causation issues. No showing is proffered that Cool Light could do any better if offered a third trial.

In summary, if a court, considering the matter *de novo* in light of the full record in this case, did not order judgment for defendant on all counts tried to the jury, notwithstanding the verdict of the jury on some counts, it should at least set that verdict aside because the verdict was contrary to the overwhelming weight of the evidence on causation issues central to every claim asserted by the plaintiff and found for the plaintiff by the jury. Thus, it was entirely appropriate that a new trial be granted.

Moreover, in the proceedings occurring after Judge McNaught's retirement, Cool Light received a *de novo* retrial of its substantive claims against GTE. Cool Light has not argued that it was foreclosed, in either trial, from fully presenting its case. Cool Light does not claim that it was impeded in conducting discovery, introducing evidence, engaging in cross-examination, or making legal arguments orally or in writing in the second trial. Thus, even if it be assumed that Judge McNaught erred in failing to recuse himself, the classic remedy has already been provided—a second trial before another judge.

Cool Light appealed from the final judgment entered after the second trial. In that appeal, however, it elected not to challenge any ruling made in the second trial. Instead it challenged only the order granting new trial and the failure to enter judgment on the verdict received in the first trial.

■ Rule 60(b) does not provide an escape from the consequences of a party's limiting the scope of its appeal. Cool Light's present motion—by its nature a Rule 60(b) motion,

whether or not it is so labeled—cannot revive rights to challenge rulings made in the second trial that it chose not to challenge in its appeal from the final judgment in this case. *See Ojeda–Toro v. Rivera–Mendez,* 853 F.2d 25, 30 (1st Cir.1988) (a party may not invoke Rule 60(b) to evade consequences of decision not to appeal where decision was a "free, calculated, deliberate choice[ ]") (quoting *Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950)).

Cool Light has failed to show a likelihood that a third trial in this case, if granted, would result in a different outcome. "[I]t is the invariable rule, and thus, the rule in this Circuit, that a litigant, as a precondition for relief under Rule 60(b), must give the trial court a reason to believe that vacating the judgment will not be an empty exercise." *Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co.,* 953 F.2d 17, 20 (1st Cir.1992) (collecting cases); *accord Cotto,* 993 F.2d 274, 280 (1st Cir.1993). *See also* Fed. R.Civ.P. 61.

The same conclusion is supported by viewing the matter from the perspective of "law of the case." Since the findings and conclusions in the second trial were not appealed, and the judgment following the second trial has been affirmed by the Court of Appeals for the First Circuit, the legal conclusions of the second trial are the law of the case. *See Lacy v. Gardino,* 791 F.2d 980, 984 (1st Cir.) (explaining the law of the case doctrine), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986).

Thus the *de novo* retrial of this action has already provided Cool Light with the only remedy to which it would be entitled even if it could establish breach of a duty of recusal.

Though the point has not been explicitly argued, I take account of the fact that Cool Light did not have a new trial before a jury. The reason, however, was Cool Light's own election to waive the demand for a jury in the second trial. It matters not what Cool Light's reasons of strategy may have been for electing to waive the jury demand for the second trial and to focus its appeal, and all its hope for judgment on a favorable jury verdict, on one contention—the argument on appeal for reversal of Judge McNaught's order granting a new trial. A party is not entitled to play out its strategic game, seeking to capitalize on what it may reasonably have evaluated as an extraordinarily favorable jury verdict rather than taking chances that a less favorable second verdict would undercut the force of its claim to judgment on the first, and after losing, then for the first time claim foul.

Cool Light made its own considered election to waive the jury demand in the second trial. It is now in no position to assert that the second trial was not the appropriate remedy for an alleged breach of a duty of recusal. For this reason, even if it were assumed that the outcome of an evidentiary hearing might be favorable to Cool Light in other respects, the relief it now seeks would still be inappropriate.

Also, in no event would Cool Light be entitled to reinstatement of the jury verdict, rendered in a trial that, under Cool Light's own contention, was impaired by bias of the presiding judge. A party is not entitled to pick and choose what it likes and dislikes about the trial and the outcome. If it claims a duty of recusal from presiding over the case, arguing, as Cool Light has done, that bias existed during the trial, it is not entitled to ask that nothing about the proceedings except one order—the grant of a new trial—be set aside so the verdict can be reinstated.

In these circumstances, I conclude that it is appropriate, also, to deny all other relief Cool Light seeks in this proceeding, including its request for further discovery. The proposed discovery and evidentiary hearings relate to issues that are not properly addressed in this court in view of the rulings explained above—and the jurisdictional and prudential considerations explained in Part VI below. The request for discovery and for an evidentiary proceeding will be denied, and all subpoenas related to those requests will be quashed.

## VI. Jurisdictional and Prudential Considerations Bearing Upon the Scope of Judicial Proceedings

A United States district court should not conduct proceedings bearing upon the merits

of serious accusations such as those made by Cool Light in the present instance without having first determined that, if the accusations were proved, (a) the court would have jurisdiction to grant some form of relief to the moving party, and (b) relief should be granted in the particular circumstances of the case. Absent such preliminary determinations, the court, having only the limited jurisdiction authorized by Article III of the Constitution of the United States and by Acts of Congress, would be allowing its processes for the adjudication of cases and controversies within its jurisdiction to be used instead for other purposes.

■ An Article III court is not a forum for adjudicating the merits of accusations against a retired judge (or, for that matter, even an active judge) of the court. Nor is it a forum for adjudicating the merits of accusations against attorneys on motion of a party in the absence of a showing that the party has a justiciable interest—that is, that the party is seeking some relief that the court has jurisdiction and authority to grant to the party for harm caused to that party's legally protected interests.

This point applies to Cool Light's allegations that speculate about how Judge McNaught might have learned of Panagiotou's previous brush with the law. Cool Light makes vague and wholly unsupported accusations of misconduct by the attorneys who represented GTE in the jury trial, one of whom had served for one year as law clerk to Judge McNaught several years before the trial. Moreover, although the allegations are replete with innuendos of intrigue and duplicity, Cool Light proffers no showing that either McCabe or Panagiotou was concerned enough at the time of their alleged observations to report their suspicions to the other or to the court. (See E. McCabe Aff. ¶¶ 10—12 and Panagiotou Aff. ¶¶ 11, 12.)

The public interest and individual interests of persons accused (including reputational and privacy interests) cannot justify a court's holding a hearing to adjudicate disputes that are not material to any claim for relief over which it has jurisdiction. Other forums exist to serve those interests, if they justify a hearing in some forum. In some instances the forum is completely independent of the Article III court. An example is a forum for consideration of complaints of misconduct of an Article III judge. See 28 U.S.C. § 372(c) (written complaints alleging that a judge has "engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" may be filed with the clerk of the court of appeals for the circuit). In other instances an appropriate forum may be a branch of a United States district court other than the judge to whom a civil case is assigned by random draw. See LR D.Mass. 83.6(5) (provisions regarding disciplinary proceedings against members of the bar of the district).

In either of these kinds of forums for consideration of charges of professional misconduct against a judge or a lawyer, provisions are commonly made for confidentiality of proceedings at an early stage before the adjudicative body has made any determination regarding the sufficiency of the proffer to warrant public exposure of the accusation. See 28 U.S.C. § 372(c)(14); Mass. SJC Rule 4:01, section 20; Rules of the Board of Bar Overseers § 3.22. It is cause for deep concern when an accusation is filed in the public records of a case pending in a United States district court that lacks jurisdiction and authority to adjudicate the merits of the accusation in that case. A practice of allowing such filings would create serious risks of improper use of this forum to make accusations publicly that could not have been made publicly in a forum with jurisdiction and authority to adjudicate the merits of the accusation. The conduct of the officer of the court who files such an accusation raises not only serious issues regarding misuse of this forum but as well serious issues regarding the evasion of the declared policies of the law regarding confidentiality of proceedings in an appropriate forum.

Moreover, with respect to such accusations against an attorney, jurisdiction of a United States district court to enforce rules of professional responsibility of attorneys, though clear, is not plenary. It is true that the kinds of sanctions that may be imposed upon an attorney may take the form of orders of preclusion or compensatory relief of advan-

tage to an opposing party in a particular civil action. The judge before whom that case is pending may—perhaps even must—exercise jurisdiction for first-instance adjudication. To the extent, however, that sanctions may bear upon the status of an attorney—either one accused or one making an accusation—as a member of the bar, authorized to practice before this and other courts in other cases, one or more among other forums may be appropriate. *See, e.g.,* LR D.Mass. 83.6(5) (Rules of Disciplinary Enforcement: Disciplinary Proceedings [against attorneys]); LR D.Mass. 83.6(4)(B) (incorporating Mass. SJC Rule 3:07).

Judicial proceedings in any court, and especially in a court of limited jurisdiction such as a United States district court, must be confined to issues within the court's subject-matter jurisdiction. An attempt by a party to place before the court matters the court cannot properly consider may be rebuffed not only by objection to the court's hearing or considering the matter but even early in the pleading stage, by motion to strike. The court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).

In a jury trial, it is part of our traditional efforts to assure fair trial that we try to prevent the jury from hearing evidence they cannot properly take into account in decision-making, rather than depend on instructing them to disregard. In a nonjury proceeding, the judge often must hear inadmissible matter in order to determine whether it is admissible. It is nevertheless improper for counsel to proffer plainly inadmissible matter in the hope of influencing the judge's decision. For even stronger reasons, it is improper for counsel to place on the public record, by filing with the clerk of the court, "immaterial, impertinent, or scandalous matter" that counsel has no reasonable basis for contending that the court should consider in determining any issue within its jurisdiction.

The processes of the court for administering justice will have been misused if it is determined that, in the present case, Cool Light has proffered no explanation of any reasonable basis for its contending that some of the materials placed on the public record in this case are matters the court can properly consider in deciding any issue before the court in this case. An example is a juror affidavit that the juror had "a general impression that Judge McNaught ... was biased in favor of GTE." (M. Fischer Aff. ¶ 5 attached to plaintiff's mot. seeking relief from judgment.) This, of course, is not a witness "testifying as an expert," Fed. R.Evid. 701. Thus, the affidavit is not admissible unless it is shown to be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." *Id.* Proffered evidence cannot meet requirements stated in the first phrase of (b)—"helpful to a clear understanding of the witness' testimony"—unless the witness has in some other part of the proffered testimony said something that satisfies the requirement of the second phrase—"helpful to ... the determination of a fact in issue." The affidavit of the juror in this instance gives no factual support for the alleged "impression" of bias—an opinion or conclusion of the affiant—and does not purport to be based on anything other than observation of the judge's conduct in the performance of judicial functions. The nature of judicial conduct during proceedings is subject to review on appeal, on properly premised grounds, and is not, generally, a basis for recusal. *See, e.g., Aggarwal v. Ponce School of Medicine,* 837 F.2d 17, 22 (1st Cir.1988) ("To sustain a charge of improper [judicial] conduct, ..., the reviewing court must find that a party was so seriously prejudiced as to be deprived of a fair trial.") (citation omitted).

It is especially important that rules about competence of jurors as witnesses and about admissibility of evidence from them, by affidavit or otherwise, be respected by members of the bar of the court as well as the court itself. The law's general policy of protection of jurors has given rise to some quite particularized rules. An example is the prohibition against inquiry into validity of a verdict.

[A] juror may not testify as to any matter or statement occurring during the

course of the jury's deliberations or to the effect of anything upon that *or any other juror's mind or emotions* as influencing the juror to assent or dissent from the verdict ..., except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the juror's attention or whether any outside influence was improperly brought to bear *upon any juror.* Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Fed.R.Evid. 606(b) (emphasis added). The emphasized phrases in this quotation make clear that the rule of preclusion goes beyond just excluding a juror's testimony about his or her own mind. Even so, this particularized rule does not extend far enough to apply to the matter now before this court. Nevertheless, the policy underlying the rule has at least equal if not greater force in the present context. I conclude that the testimony of a juror concerning the juror's opinion—or a recitation of the juror's perception of the behavior of the judge during judicial proceedings on the basis of which the juror formed that opinion—is not admissible evidence in judicial proceedings to which the Federal Rules of Evidence apply.

## VII. Grounds of Preclusion Relevant to Cool Light's Claims for Relief

Independently of the grounds explained in Parts V and VI for denying all relief requested by Cool Light in motions now before the court, conduct of Cool Light and its authorized agents invokes precedents for precluding any relief that might otherwise have been appropriate.

### A. Cool Light's Post-verdict Contact with Jurors

■ Cool Light claims that its conduct in gathering the evidence it proffers to support its motion was permissible under the law applicable to attorneys who practice in the Commonwealth of Massachusetts. (Cool Light's reply memorandum, dated Dec. 22, 1992 at 5.) It argues in the alternative that, to the extent its conduct was questionable, "the ethical prohibitions [of this Circuit] are

not entirely precise...." (*Id.* at 6.) Both contentions lack merit.

First Circuit law governing attorney and party contact with jurors post-verdict is, and was at the time of the jury trial in this case, entirely clear in prohibiting correspondence and communication of the kind that admittedly occurred in this case.

> [T]his Circuit prohibits the post-verdict interview of jurors by counsel, litigants, or their agents except under the supervision of the district court, *and then only in such extraordinary situations as are deemed appropriate.* Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties.

*United States v. Kepreos,* 759 F.2d 961, 967–68 & n. 5 (1st Cir.) (emphasis added), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985); *accord Dall v. Coffin,* 970 F.2d 964, 972 (1st Cir.1992). The record shows that Judge McNaught, in his post-verdict instructions to the jury, in the presence of Cool Light's attorneys and others, explained that the attorneys were prohibited from talking to the jurors about their deliberations and cited *Kepreos.* (Trial Tr., vol. 26 at 20, attached to E. McCabe 2d Aff.)

The facts speak for themselves. Plaintiff corporation's president Panagiotou telephoned the foreperson of the jury, encouraging him to telephone plaintiff's attorney. The unrefuted fact is that the juror's calls to McCabe *were* solicited, if not by McCabe then by Panagiotou who was Cool Light's "agent." Nothing is proffered by Cool Light to explain what prompted Panagiotou to call Koerner. Nor does Cool Light purport to provide a full account of this conversation. Juror Koerner's statement that he "was pleased to hear from Panagiotou" (Koerner Aff. ¶ 2) does not excuse Panagiotou's actions. Plaintiff's attorney accepted the calls of one juror after another with the knowledge that Panagiotou had participated in prompting the calls. The attorney gathered

information from the jurors, and apparently, prepared affidavits for their signatures.

Plaintiff's tortured attempts to define and give to the word "interview" a contextual meaning permitting this conduct are to no avail. The argument that no "interview" of any juror took place approaches, if not crosses the line into, the frivolous. Although attorney McCabe may not have "initiated" the contact in the first instance, Panagiotou, by his own testimony, did make the first call, and McCabe by his actions encouraged the violation of the First Circuit prohibition. McCabe had a responsibility to know that actions such as those of Panagiotou violated the First Circuit's mandate, and, once informed of Panagiotou's actions, to do everything possible to discourage further violation. Instead, he expanded the violation.

Attorney McCabe's conduct exceeded the bounds of conduct permitted of an officer of the court. His failure to know those bounds is no excuse. If he knew in general about the First Circuit's firm rule on this subject and thought he had arguable grounds that his proposed course of conduct was not a violation, his failure to bring the matter to the attention of the court and seek court authorization for contact with jurors was inexcusable. Attorney McCabe chose instead to proceed first with a forbidden course of conduct and then present to this court an argument that, viewed most charitably, does not even measure up to what the First Circuit has recently described as "complicated, counterintuitive and ultimately wrong." *Laborde–Garcia v. Puerto Rico Telephone Co.*, 993 F.2d 265, 268 (1st Cir.1993). Moreover, as the First Circuit added in that case, with respect to an argument in support of a claimed qualified immunity of a public official on the ground that constitutional protection for a property interest was not clearly established:

> [W]e do not believe that the potential existence of an unusual, sophisticated, and ultimately wrong legal argument, is sufficient, legally speaking, to muddy what, for immunity purposes, would otherwise amount to clear legal waters. Were that not so, given the ingenuity of the bar, "qualified immunity" would become absolute in that it would become available in virtually any case argued by a creative lawyer.

*Id.* at 268. Creative word play is not an excuse for violation by an officer of the court of a rule of law as clear and explicit as the First Circuit's rule regarding post-verdict contact with jurors.

Moreover, the precise details of the facts regarding who initiated contacts in this instance, though they may be material to the issue of knowing violation or reckless disregard, are immaterial to determining that a violation of the First Circuit law against post-verdict contact with jurors did occur. Even if the jurors initiated the contacts and were zealous in their pursuit of McCabe, he remained responsible for knowing the boundaries of the law and complying with them. McCabe's portrayal of himself as a mere conduit for the four jurors' concerns (McCabe 2d Aff. ¶ 13) does not relieve him of his responsibilities as an officer of the court for compliance with the First Circuit law on this subject. McCabe distorts both the spirit and the letter of that law in arguing that the First Circuit only prohibits those contacts retrospectively appraised as constituting harassment. No such limitation is either expressed or reasonably to be perceived as implicit in any First Circuit precedent.

GTE suggests factual issues as to whether harassment of the jurors may have, in fact, taken place, despite Cool Light's contrary portrayal of the matter. GTE, by affidavits of attorney Allan van Gestel and Carol A. Huban, secretary to van Gestel, relay the following information. Huban states that on September 16, 1992 she answered van Gestel's direct line and spoke with a man who identified himself only as a juror in the first Cool Light trial and asked to speak with van Gestel. (Huban Aff. ¶ 2.) Huban put the caller on hold and relayed the information to van Gestel. (*Id.* ¶ 3.) According to Huber, van Gestel indicated that "he was uncertain whether it was proper for him to speak to the juror" and instructed Huber to advise the caller to call back in two days by which time van Gestel would have checked the law and ethical rules. (*Id.* ¶ 3.)

According to Huber, after she relayed this message, the caller stayed on the line and

described to her the reason for his call. (*Id.* ¶ 4.) Afterward Huber, at the request of van Gestel, typed a memorandum to the file recording the conversation. This memorandum is submitted to the court with Huban's affidavit. Huber's memorandum states: "He [the caller] stated that one of the other jurors has contacted the McCabe Group, and the McCabe Group is going to put together an Affidavit to be signed by some of the jurors, who are upset with the fact that the matter was overturned." (*Id.*)

According to Huber's memorandum, the caller stated that another juror had contacted him by mail, notifying the caller that he had "contacted the McCabe Group with a package of information," and encouraged the caller to contact the McCabe Group if he wanted "to become involved." (Huber Aff. (Memorandum to File).) With the letter, according to the caller, were regulations entitled "Investigation of Jurors." (*Id.*)

Most troubling to the court is the following statement Huber's memorandum attributes to the caller: "The anonymous man said he didn't want to sign the Affidavit and he doesn't know how to stop him [the other juror]." (*Id.*)

The court has an obligation to protect jurors against harassment by litigants in connection with their jury service. It is true that the law of the First Circuit does not prevent jurors from contact among themselves. Nevertheless, any actions of Panagiotou and McCabe that might be construed as encouraging or facilitating juror-to-juror contacts to stir up support for Cool Light's position is a very different matter.

At this time, however, I do not undertake to make findings of fact regarding the potential scope of misconduct that this evidence raises. For the reasons explained in this Memorandum, I conclude that the appropriate actions for the court to take on the matters now pending before the court do not depend on such findings.

■ Even assuming Panagiotou and McCabe did not take any action to encourage juror-to-juror contact, I find that the post-verdict contacts Panagiotou and McCabe made were violations of the First Circuit law

regarding post-verdict contact with jurors. For this reason, independently of the grounds explained in Part V, I conclude that it is appropriate to deny Cool Light's request to interview the jurors who, in spite of Koerner's entreaties, have chosen not to come forward.

## B. An Attorney's Responsibilities, as Both Advocate and Officer of the Court, when Alleging Misconduct of a Judge and an Opposing Attorney

McCabe's delay in investigating the controlling law and bringing this motion to the attention of the court in a timely manner is not excused by his claimed lack of familiarity with prevailing First Circuit law or his recuperation from surgery.

First, the court cannot accept, as an excuse, McCabe's protests of unfamiliarity with the First Circuit law governing contact with jurors. It is his duty as a member of the bar of this court to know that law. Also, Judge McNaught's post-verdict instructions to the jurors in McCabe's presence gave McCabe actual notice of the existence of this body of law. Second, McCabe is not a sole practitioner but a named principal in a law firm. All the pleadings in this case bear the names of three attorneys certified to practice before this court. McCabe has not explained why he was the only person in his firm able to conduct the necessary legal research into the law bearing upon this matter.

■ The court is troubled also by McCabe's dual role as witness and attorney at the same time on the primary claim for relief that he and his client seek to present to the court at this time. *See Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 674 n. 1 (1st Cir.1992) (expressing concern about "counsel's decision to make herself a potential witness in pretrial proceeding" and noting potential impact on both attorney/client and attorney/court relationship). *See also* LR D.Mass. 83.6(4)(B) (incorporating Mass. SJC Rule 3:07, DR 5–102 (concerning attorney as witness)). McCabe's supplementary affidavit dramatically illustrates the wisdom of a prohibition against an attorney's simultaneously serving as witness and advocate. The supplementary affidavit reads more like a brief,

arguing law and inferences, than a statement limited to a recitation of admissible testimony—or even testimony for which the advocate could at least assert a plausible argument for admissibility. The affidavit, on its face, evinces insensitivity of the affiant to his duty to the court to limit the affidavit to testimony and make his arguments separately in a memorandum or brief.

I note also that Cool Light has made serious allegations publicly, by filings with the Clerk, without advance notice to GTE, to Judge McNaught, to the attorneys accused of serious professional misconduct, or to the trial judge currently assigned to the case. As was plainly to be expected, the charges have been reported in the press. The submissions before the court, however, are totally lacking in admissible evidence, by affidavit or otherwise, to support findings of fact sustaining these serious charges. This course of action is contrary to the statutory provisions for protection against public airing of unsubstantiated allegations in the context of complaints against judges, a forum for which is provided under 28 U.S.C. § 372(c)(14). If that statute is not directly in point here, it is at least instructive by way of comparison.

### VIII. Conclusions

For the reasons explained in Parts III–VII above, I conclude that Cool Light's motion for relief from the Final Judgment for GTE in this case and from various orders that preceded the Final Judgment must be denied.

For the reasons explained in Part III and in Parts VI and VII, I conclude that there is a prima facie basis for believing

(1) that Cool Light and its lead counsel, Edwin A. McCabe, and its principal officer, George Panagiotou, in violating the law of the First Circuit with respect to post-verdict contact with jurors, each did so knowingly, and in the alternative did so with the state of mind of willful blindness to and reckless disregard for the law of the First Circuit regarding post-verdict contacts with jurors;

(2) that Cool Light and Edwin A. McCabe violated Rule 11 of the Federal Rules of Civil Procedure;

(3) that Edwin A. McCabe violated Mass. SJC Rule 3:07, DR5-102 (concerning lawyer as witness); and

(4) that sanctions, if any are determined to be appropriate in this forum, either in lieu of or in addition to sanctions that may be appropriate in some other forum, may include monetary or other sanctions providing some degree of compensatory relief to GTE and to other persons against whom Cool Light has made accusations in these proceedings.

An order will be issued scheduling a hearing to consider whether the court should (a) find that each of the violations described in paragraphs (1)—(3) above was committed, and (b) impose appropriate sanctions. The Clerk will set forthwith a conference with counsel for all interested persons, to hear proposals from all counsel and set a schedule for a show-cause hearing, if appropriate, and for prompt disposition of all matters remaining for determination.

Because of the First Circuit policy against piecemeal appeals and the pendency of issues regarding sanctions that remain for determination, the court does not make a Final Order at this time. Instead, only an Interlocutory Order is to be entered.

### INTERLOCUTORY ORDER

For the foregoing reasons, it is Ordered:

(1) The court DENIES the requests for oral argument on the following motions: Cool Light's motion for relief (at 5); motion of Palmieri to quash and for protective order (at 2); Cool Light's motion seeking permission to interview jurors (at 2); Cool Light's motion for appointment of a magistrate judge as Special Master (at 4).

(2) The court DENIES the motion of Cool Light for relief from orders and judgment (Docket No. 242, filed Dec. 1, 1992).

(3) The court ALLOWS the motion of GTE to quash all deposition subpoenas and for entry of protective order (Docket No. 247, filed Dec. 14, 1992).

(4) The court ALLOWS the motion to quash subpoenas of Judge John J. McNaught, Elisabeth Medvedow, Mary Lou

Moran, and Patricia Casey–Price (Docket No. 250, filed Dec. 15, 1992).

(5) The court ALLOWS the motion of Ann L. Palmieri to quash deposition subpoena and for protective order (Docket No. 255, filed Dec. 15, 1992).

(6) The court ALLOWS the motion of Charles Donelan to quash subpoena (Docket No. 258, filed Dec. 15, 1992).

(7) The court DENIES the motion of Cool Light seeking permission to interview jurors (Docket No. 261, filed Dec. 22, 1992).

(8) The court DENIES Cool Light's motion for appointment of a magistrate judge as Special Master (Docket No. 270, filed Jan. 28, 1993).

(9) The court has determined that there is a prima facie basis for believing

(1) that Cool Light and its lead counsel, Edwin A. McCabe, and its principal officer, George Panagiotou, in violating the law of the First Circuit with respect to post-verdict contact with jurors, each did so knowingly, and in the alternative did so with the state of mind of willful blindness to and reckless disregard for the law of the First Circuit regarding post-verdict contacts with jurors;

(2) that Cool Light and Edwin A. McCabe violated Rule 11 of the Federal Rules of Civil Procedure; and

(3) that Edwin A. McCabe violated SJC Rule 3:07, DR5–102 (concerning lawyer as witness).

A conference is set for 9:00 a.m., June 29, 1993, to schedule further proceedings at which all parties may be heard with respect to whether each such violation has occurred and, if so, what if any, compensatory sanctions should be imposed on Cool Light, George Panagiotou, and attorney Edwin A. McCabe.

### FINAL ORDER

On the findings and conclusions and for the reasons stated in the Memorandum and Order of June 7, 1993, and supplemental findings, conclusions, and reasons stated on the record at the hearing of August 6, 1993, it is ORDERED:

(1) The court DENIES the motion of Cool Light for relief from orders and judgment (Docket No. 242, filed December 1, 1992).

(2) No party having elected to press a request for sanctions, and the court having determined that it should not, *sua sponte,* impose any sanction, the court determines that all pending matters have been resolved and directs that the Clerk close the file in this case.

(3) Costs of the proceedings on Cool Light's motion for relief from orders and judgment are awarded against Cool Light.

### Memorandum

Part VII of the Memorandum of June 7, 1993 addressed possible grounds for precluding Cool Light's claims for relief from the final judgment in this case that are independent of the reasons for precluding relief explained in Parts V and VI.

Part VIII addressed the need for a show-cause hearing and further findings by the court before a final adjudication of issues discussed in Part VII. A further hearing on these matters was also necessary to determining whether sanctions, under Fed. R.Civ.P. 11 or any other authority, might appropriately include awards to GTE and others, reimbursing them for attorney fees incurred by them in responding to Cool Light's claims for relief from judgment.

At the further hearing of August 6, 1993, counsel for GTE and each other person who might have sought attorney fees advised the court that because of their clients' interests in closing this matter promptly and finally they would not press any request for attorney fees or sanctions. In these circumstances, weighing the interests of all parties in prompt entry of a Final Order closing all proceedings in this court in this case, and the undesirability of imposing upon parties (who might benefit from a sanction, which included an award of attorney fees) delays and expenses incident to further proceedings they did not request, the court determined that it should not, *sua sponte,* impose any sanction or conduct any further proceedings.

Accordingly, the court directed that the Clerk enter a Final Order forthwith.